[Civ. No. 19508. Third Dist. June 30, 1981.]

KENNETH H. EARP, Plaintiff, Cross-defendant and Appellant, v. W. G. NOBMANN et al., Defendants, Cross-complainants and Respondents;
ROBERT A. KOETITZ, Cross-defendant, Cross-complainant and Appellant.

COUNSEL

McDonald, Duggan & Foppoli and Dennis D. McDonald for Plaintiff, Cross-defendant and Appellant.

Hefner, Stark & Marois and Kenneth R. Stone for Cross-defendant, Cross-complainant and Appellant.

Feldman, Waldman & Kline, Patricia S. Mar and Michael A. Adelman for Defendants, Cross-complainants and Respondents.

OPINION

**REYNOSO, Acting P. J.**—Plaintiff and cross-defendant Kenneth H. Earp, and cross-defendant and cross-complainant Robert A. Koetitz, appeal from a judgment of the Superior Court of Sacramento County in favor of defendants, cross-complainants and cross-defendants W. G. Nobmann and Harbor Properties, Inc. (Due to a unity of interest Harbor and Nobmann sometimes will be referred to jointly as Harbor.) The trial court found Earp to be liable to Harbor for wrongfully recording a lis pendens against certain property owned by Harbor, and for unprivileged disparagement of title. The court found Koetitz to be liable to Harbor for breach of an oral contract and for negligence as a real estate broker. Claims by Earp and Koetitz were denied by the court.

On appeal Earp contends: (1) his actions were privileged; (2) the findings that he acted in bad faith and with malice are not supported by the evidence; (3) the trial court erred in permitting amendment of the cross-complaint after the announcement of intended decision; (4) an erroneous measure of damages was applied; and (5) he should not be jointly and severally liable with Koetitz. On appeal Koetitz contends: (1) the trial court erred in permitting the introduction of extrinsic evidence of an oral agreement collateral to a written contract; (2) his actions were not the proximate cause of injury to Harbor; (3) he cannot be held liable for attorneys' fees; and (4) he is entitled to payment of his real estate commission for arranging a sale of real property.

As to the appeal of Earp we conclude: (1) the recordation of the lis pendens was absolutely privileged and does not support the award of damages; (2) the extrajudicial communications of Earp were only subject to a qualified or conditional privilege; however, the trial court erred in permitting Harbor to file a so-called amendment to conform to proof after the announcement of intended decision to set forth a cause of action based on those communications; (3) an erroneous measure of damages was used by the trial court. Accordingly we reverse the portion of the judgment which awards damages against Earp, said reversal being without prejudice to Harbor to seek recovery in further proceedings. We affirm the judgment against Earp in all other respects.

As to the appeal of Koetitz we conclude: (1) the court did not err in permitting the introduction of the extrinsic evidence of an oral agreement; (2) the evidence supported the finding that Koetitz was negligent and that his negligence was the proximate cause of injury to Harbor; (3) under the circumstances of this case attorneys' fees expended by Harbor in clearing its title to real property were properly awarded against Koetitz, but that one element of the damage award was speculative and uncertain and was not properly awarded; (4) Koetitz is not entitled to a real estate commission. Accordingly we modify the damage award against Koetitz and affirm the judgment as modified.

Nobmann is the president and sole shareholder of Harbor Properties, Inc. In 1977 Harbor acquired a 437-acre ranch in Elk Grove. At about that time Nobmann first met Koetitz, who is a licensed real estate broker. In late summer 1978, Nobmann and Koetitz discussed whether Harbor would be willing to sell the Elk Grove ranch, and Nobmann said that he would be interested in selling if a price of $1,800 per acre could be acquired. Nobmann spoke with Koetitz again in 1979, and

again stated that he would sell the ranch if his price of $1,800 per acre were offered.

In March 1979, Koetitz showed the ranch to Earp, who became interested in purchasing it. At about this time the 6-B Cattle Company also became interested in the ranch. In late March 6-B made an offer to purchase the ranch which was well below the asking price, and Harbor made a counteroffer to 6-B. On April 2, 1979, Koetitz met with Earp and drew up a "deposit receipt" offer to purchase the ranch. The purchase price in the offer was $786,600, which Earp intended to pay by securing an institutional loan for $455,885, and by assigning three unsecured, interest-only promissory notes to Harbor. Earp hoped to acquire the ranch without personally expending any cash.

Koetitz called Nobmann and informed him that he had an offer on the ranch. Nobmann suggested that he mail the offer, but Koetitz desired to present it personally so a meeting was set for April 4, 1979. When Koetitz presented the offer Nobmann indicated that he was happy with the price, but asked whether he was "getting . . . into trouble" with the unsecured notes. Koetitz told Nobmann that unsecured notes are better than secured notes, a curious belief to which Koetitz adhered at trial. Nobmann told Koetitz that he desired to effect a tax-free exchange for other property, and to this end Koetitz wrote: "Subject to Buyer cooperating w/sellers' affecting a tax-deferring exchange out via other ppty; and in the event Buyer is unable to close by 5-15-79 he may then have possession of ppty upon deposit of an additional $25,000." Nobmann signed the offer with the handwritten additions, but did so with the express condition that he would have the opportunity to take it to his office and get the approval of his controller. Nobmann told Koetitz that he would call by 10 o'clock the following morning and give him an answer on the whole thing.

After leaving Nobmann, Koetitz visited Earp and informed him that Nobmann had accepted but that he had until 10 a.m. the following day to withdraw his offer, or to withdraw his acceptance of Earp's offer. Earp initialed the counter terms suggested by Nobmann.

On the morning of April 5, 1979, Nobmann gave the offer to Mr. Brusco, Harbor's controller and secretary. Brusco was very critical of the offer, and informed Nobmann that the deal was disadvantageous. Among other things Brusco believed that no third party would accept assignment of the unsecured promissory notes and therefore a tax-free

exchange could not be worked out, and that the deal as offered would actually cost Harbor out-of-pocket expenses to consummate. He advised Nobmann to cancel. Brusco also suggested that he would meet personally with Earp to attempt to work out a deal that would be satisfactory.

After meeting with Brusco, Nobmann called Koetitz and told him to hold up on the whole thing, not to do anything with it, and not to put it into escrow. Later that day Brusco met with Earp, but at that time Earp made it clear that he was not interested in effecting a real property exchange, the only deal he would accept would allow him to unload the unsecured notes.

On April 6, 1979, Koetitz claimed that he had the "green light" to proceed, and he wrote to Nobmann to inform him that he was opening an escrow. When Nobmann received this communication on April 9, 1979, he wrote to Koetitz and confirmed the fact that he had withdrawn his acceptance of the Earp offer. Nobmann stated that he was happy with the price in the offer but not with the terms, and that he would continue to attempt to work out terms that were agreeable. When he received this letter Koetitz wrote to the title company with which he had opened the escrow and stated that he had misunderstood his earlier conversation with Nobmann and that the escrow was opened without authorization.

On April 11, 1979, attorneys for Harbor wrote to Koetitz and informed him that they had advised Harbor that it was not bound by the purported agreement to sell the ranch. Among the reasons given was the withdrawal of Nobmann's acceptance, the indefiniteness of the offer, and the fact that Harbor was record owner of the property and Nobmann did not have the authority to enter into a contract to sell Harbor's real property. The attorneys suggested terms by which the sale could be consummated.

On April 16, 1979, Koetitz wrote to Earp and enclosed a copy of the letter from Harbor's attorneys. He described the letter as "typical lawyer talk," and stated that he did have the "green light" to proceed from Nobmann. Koetitz also stated that regardless if Nobmann "... succeeds in blowing this sale too, I'm going after the commission. Regardless of the nit-picking, you and he have a bonafide agreement, so he owes the commission. Koetitz also wrote to the Harbor attorneys to inform them that an agreement had been reached.

Earp replied to Koetitz concerning the Harbor letter and stated that he believed he had an agreement and intended to take possession on May 15, 1979. Thereafter the correspondence of the parties indicates that their positions became rigid, Harbor insisting that there was no agreement, and Earp and Koetitz insisting that there was an agreement.

On April 10, 1979, 6-B Cattle Company prepared an offer to purchase the Harbor ranch for the price of $792,000, in an all-cash deal. This offer was mailed to Nobmann, and he received it within a few days after it was prepared. When Nobmann received the 6-B offer he called their agent and informed him that Harbor had made a counteroffer to Earp (the letter from Harbor's attorneys) and that he would have to wait seven days before the 6-B offer could be considered.

When Harbor did not receive an acceptance of its counteroffer from Earp it entered into negotiations with 6-B. On April 24, 1979, two detailed written agreements were entered into between Harbor and 6-B. The first was an agreement for the sale and purchase of the Elk Grove ranch by 6-B for cash. The second was an agreement for the exchange of real property so that Harbor could effect a tax-free exchange. On May 25, 1979, Harbor entered into an agreement with Peter A. and Vernice H. Gasser to purchase a ranch for the price of $1 million, with the provision that the Gassers would cooperate with Harbor in effecting a three-way tax-free exchange pursuant to the agreement with 6-B.

On June 1, 1979, Earp filed a complaint for specific performance and for breach of contract against Harbor. Earp filed and recorded a notice of pending action (Code Civ. Proc. § 409), on the ranch. As the result of the filing of the notice of pending action Harbor was unable to obtain title insurance, and the Federal Land Bank refused to consider 6-B's application for a loan. As the result of the inability of Harbor to complete the 6-B sale, it was forced to obtain costly extensions of the contract to purchase the Gasser ranch.

Harbor moved to expunge the notice of pending action recorded by Earp. While the motion was pending Harbor answered the complaint and cross-complained against Earp and Koetitz for declaratory relief and damages. Koetitz later cross-complained against Harbor for the amount of his commission claimed to be due under the Earp-Harbor sale agreement. On July 27, 1979, the trial court denied the motion to expunge the notice of pending action, but ordered that within five working days Earp must post a bond in the amount of $300,000. Earp did

not post the required bond, but instead filed a petition for a writ of mandate in this court. We denied the petition. Although he was financially able to do so, Earp refused to post a bond and the notice of pending action was expunged.

When the notice of pending action was ordered expunged for the failure to post a bond, Earp's attorneys wrote to the Federal Land Bank and the real estate agent of 6-B to inform them that although the lis pendens had been expunged Earp still contended that he had an interest in the ranch and that any purchase completed by 6-B with funds derived from a loan from the land bank would be subject to that interest. As a result Harbor remained unable to procure title insurance, and 6-B was unable to procure a loan and the purchase was not completed.

The trial court found that no contract for the sale of the Elk Grove ranch by Harbor to Earp was ever entered into, but that Earp and Koetitz proceeded to treat the deposit receipt as though it were a contract and engaged in activities aimed at consummating a sale. The filing of the lis pendens by Earp and the communication in the letter to the Federal Land Bank after the lis pendens was expunged had the effect of preventing Harbor from completing its contract to sell the ranch to 6-B, which in turn prevented it from completing its contract to purchase the Gasser ranch. The court found that Earp acted without privilege, with malice, and in bad faith. The court found that Koetitz acted negligently, wrongfully, and with willful and reckless disregard for the rights of Harbor, and that he breached his oral agreement with Nobmann in proceeding with the agreement after Nobmann had informed him that he revoked his acceptance pursuant to the reservation of the power to do so. The court held Earp and Koetitz jointly and severally liable for damages in the sum of $125,332.57.

EARP'S APPEAL

I

Earp was found liable to Harbor for disparagement of title both for recording his notice of lis pendens and for directing the communication to the Federal Land Bank after the lis pendens was expunged. He contends that both of these actions were absolutely privileged under Civil Code section 47, subdivision 2. ■ That subdivision states the long established rule that publications made in the course of a judicial proceeding are absolutely privileged. (*Albertson* v. *Raboff* (1956) 46

Cal.2d 375, 379 [295 P.2d 405].) The Supreme Court has expressly held that the absolute privilege extends to the recordation of a lis pendens. (*Ibid.*) In the face of such directly controlling precedent the portion of the judgment which held Earp liable for disparagement due to the recordation of a lis pendens was in error.

Harbor contends, however, that the Legislature has taken action to "stop the free ride" granted by the decision holding a lis pendens to be absolutely privileged. In 1968 the Legislature added sections 409.1 through 409.6 to the Code of Civil Procedure. (Stats. 1968, ch. 815.) Pursuant to section 409.1, a party to an action may move for expungement of a lis pendens. Upon such a motion: "The court, as a condition of granting or denying the motion to expunge, may require that the party prevailing upon such motion give the other party an undertaking of such nature, and in such amount as shall be fixed by the court, such undertaking to be to the effect that such prevailing party will indemnify the other party for all damages which he may incur if he ultimately prevails in the action." (Code Civ. Proc., § 409.1, subd. (b), par. 2.)

Harbor argues that the protections granted a landowner by the enactment of Code of Civil Procedure sections 409.1 through 409.6 indicate that the Legislature intended to abolish the absolute privilege to record a lis pendens. We cannot agree. Had the Legislature intended such a result it could easily have so said. Instead, the Legislature said: "Nothing contained in this title [Code Civ. Proc., §§ 409-409.7] shall affect or limit the liability otherwise existing of any person recording a notice of pendency of action for damages proximately caused thereby." (Code Civ. Proc., § 409.6.) We must take the Legislature at its word and hold that the addition of sections 409.1 through 409.6 to the Code of Civil Procedure did not affect the liability of a person recording a lis pendens. Since such a person is absolutely immune from a cause of action for disparagement of title, and since Harbor neither alleged nor proved any other cause of action, such as malicious prosecution or abuse of process, we must hold that the trial court erred in finding Earp liable to Harbor for recording the lis pendens.

## II

Pursuant to the statutory scheme, Harbor moved for expungement and the trial court ordered Earp to provide an undertaking in the amount of $300,000 to provide for indemnity to Harbor. Although Earp was financially able to provide such an undertaking, he chose not to do

so and instead attempted to circumvent the statutory provisions of the lis pendens law for the protection of landowners by permitting the lis pendens to be expunged and by personally notifying nonparties of his claim of an interest in the land. By refusing to comply with the statutory scheme for the protection of the landowner litigant, Earp voluntarily excluded himself from the absolute privilege accorded to one who records a lis pendens. ■ He contends, however, that the absolute privilege extends to the nonstatutory self-help remedy he chose.

The requirements for the application of an absolute privilege for publications in a judicial proceeding were discussed in *Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818, at pages 823 through 825 [106 Cal.Rptr. 718]. We quote, with the omission of citations, the discussion. (Italics in original):

"*The* obvious *purpose of section 47 is to afford litigants the freedom of access to the courts* to secure and defend their rights without fear of being harassed by actions for defamation; *and to promote the unfettered administration of justice* even though as an incidental result it may in some instances provide an immunity to the evil-disposed and malignant slanderer. Thus, the application of the absolute privilege *on certain occasions* must be confined within narrow limits and the tendency of the courts is not to extend such limits unless the public policy upon which the privilege rests is found to exist in a new situation. Accordingly, while it has been held that there is a tendency to extend the absolute privilege to occasions where the communication is provided for and required by law, the class of occasions where the publication of defamatory matter is absolutely privileged is confined to cases in which the public service or the administration of justice requires complete immunity.

"The California law is in complete accord with these principles. Thus, under Civil Code section 47, subdivision 2, a publication or broadcast is privileged only on certain occasions, namely, in (1) legislative or (2) judicial proceedings, or (3) other official proceedings authorized by law. Although defamatory publications made in the course of a judicial proceeding are absolutely privileged even if made with actual malice, the absolute privilege attaches only to a publication that has a reasonable relation to the action, is permitted by law *and*, more importantly, *if it is made to achieve the objects of the litigation.* If these requirements are met, the publication is absolutely privileged even though made outside the courtroom and no function of the court or its officers is invoked.

And although the cases stress that to be privileged under subdivision 2 of section 47 the defamatory matter need not be relevant, pertinent or material to any issue before the court, *it is an absolute necessity that the publication have some connection or logical relation to the judicial proceeding.* The California cases likewise delineate the circle of persons to whom the judicial privilege is applicable. In harmony with the Restatement of Torts, sections 585-589, the privilege has been held to extend to judges and other judicial officers; witnesses and prospective witnesses; and jurors. It follows, therefore, that absolute privilege in judicial proceedings is afforded only if the following conditions have been met: the publication (1) was made in a judicial proceeding; (2) had some connection or logical relation to the action; (3) was made to achieve the objects of the litigation; and (4) involved litigants or other participants authorized by law."

In *Bradley* v. *Hartford Acc. & Indem. Co., supra*, it was alleged that the defendants made certain publications during and after the pendency of a civil action which accused the attorneys of record and a litigant of subornation of perjury and other illegal conduct. The Court of Appeal noted that since the publications were filed with the court "some relationship" to the action could be established, but that fact, standing alone, did not sustain the claim of absolute privilege. The court said: "... in determining whether or not the defamatory publication should be accorded an absolute privilege, *special emphasis must be laid on the requirement that it be made in furtherance of the litigation and to promote the interest of justice.* Only if this requirement has been satisfied, is it appropriate for the courts to define liberally the scope of the term 'judicial proceeding' and the persons who should be regarded as litigants or other participants." (30 Cal.App.3d at 826, italics in original.)

The reason the recording of a *lis pendens* was held to be absolutely privileged in *Albertson* v. *Raboff, supra*, was because it is a publication required or permitted in the course of a judicial proceeding. (46 Cal.2d at pp. 380-381.) Earp's communications to the nonparties to the litigation were neither required nor permitted by statute. It cannot be denied that in making the communications Earp intended to achieve his own objects and to secure an advantage in the litigation. That factor alone, however, does not compel that such communications be considered absolutely privileged. (See *Kinnamon* v. *Staitman & Snyder* (1977) 66 Cal.App.3d 893, 896-897 [136 Cal.Rptr. 321].) In considering whether the communications were absolutely privileged special emphasis must

be given to whether the communications were made in furtherance of the litigation and to promote the interest of justice.

Earp chose the course of action he followed in order to defeat the statutory scheme and the court order for the protection of his adversary. His actions were not intended to further the litigation and to promote justice, but rather were intended to circumvent a judicial determination with which he was unhappy and to impede the interests of justice implicit therein. Under such circumstances we do not find Earp's extrajudicial communications to have been absolutely privileged under Civil Code section 47, subdivision 2.

### III

■ Although Earp's extrajudicial communications were not absolutely privileged under Civil Code section 47, subdivision 2, they were subject to a qualified or conditional privilege under subdivision 3 of that section. Subdivision 3 provides that a communication made without malice to a person interested in the subject matter of the communication by another person interested in the subject matter of the communication is privileged. ■ Such a privilege is lost, however, where the person making the communication acts with malice. Malice exists where the person making the statement acts out of hatred or ill will, or has no reasonable grounds for believing the statement to be true, or makes the statement for any reason other than to protect the interest for the protection of which the privilege is given. (*Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, 797 [197 P.2d 713]; *Russell v. Geis* (1967) 251 Cal.App.2d 560, 566 [59 Cal.Rptr. 569]. See also *Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 413 [134 Cal.Rptr. 402, 556 P.2d 764].)

The trial court found that Earp acted without privilege, with malice, and in bad faith. Earp contends that the findings are not supported by the evidence, and that in any event the court erred in permitting Harbor to amend the cross-complaint after the announcement of intended decision to set forth the extrajudicial communications as a basis for relief. ■ We agree that the court erred in permitting the amendment of the cross-complaint, and thus do not consider whether the evidence supports the findings.

The original cross-complaint was filed prior to the order expunging the lis pendens and before the extrajudicial communications had been

uttered. The cross-complaint set forth only the recordation of the lis pendens as a disparaging action. Harbor did not move to amend the cross-complaint at any time prior to trial, the cross-complaint was not superseded by a pretrial order, and in their trial brief Harbor sought recovery only on the ground of disparagement by the recordation of a lis pendens. After the announcement of intended decision and the filing of proposed findings of fact, Harbor orally asked to be allowed to file an amendment to the cross-complaint. The court agreed to permit such filing and deemed the allegations denied so that Earp would not be required to answer.

The so-called amendment to conform to proof was not properly so designated. Code of Civil Procedure section 471 provides that where the allegation of the claim or defense to which proof is directed is unproved, not in some particular or particulars only, but in its general scope and meaning, it is not to be deemed a case of variance but a failure of proof. The cross-complaint sought recovery solely upon the ground that Earp wrongfully filed a notice of pending action, an act which was absolutely privileged and cannot be held to have imposed liability upon him. The cross-complaint thus set forth no ground upon which Earp could be required to respond in damages.

■ Although the courts are liberal in permitting amendments to conform to proof, one limitation remains. That is that the amendment to conform to proof must not introduce a new cause of action or introduce a new issue, or substantially change the claim or defense. (*Brautigam* v. *Brooks* (1964) 227 Cal.App.2d 547, 561 [38 Cal.Rptr. 784].) The phrase "new cause of action" is narrowly construed, that is, so long as the amendment to the complaint is based upon the same general set of facts it will not be held to introduce a new cause of action. (See *Austin* v. *Massachusetts Bonding & Insurance Co.* (1961) 56 Cal.2d 596, 601 [15 Cal.Rptr. 817, 364 P.2d 681]. And see 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 1080, pp. 2656-2657.) ■ The amendment alleged facts entirely outside the cause of action stated in the cross-complaint. In fact, the actions for which Harbor now seeks to uphold the award of damages against Earp had not even occurred at the time the cross-complaint was filed.

The cross-complaint, whether original or amended, can properly speak only of things which occurred either before or concurrently with the commencement of the action. (*California etc. Co.* v. *Schiappa-Pietra* (1907) 151 Cal. 732, 742 [91 P. 593].) Matters which occur

after the date of the complaint (or in this case cross-complaint) must be brought into the pending action, if at all, by means of a supplemental complaint. (*Ibid.*) The filing of a supplemental complaint requires a noticed motion. (Code Civ. Proc., § 464; 3 Witkin, Cal. Procedure, *supra*, Pleading, § 1084, p. 2663.) Harbor did not move for leave to file a supplemental cross-complaint, and the amended cross-complaint could not properly be filed as an amendment to conform to proof. It was thus error for the trial court to permit the filing of the so-called amendment to conform to proof.

Harbor argues that Earp did not establish that he was prejudiced due to the filing of the amendment. The failure of Harbor to proceed by noticed motion, as it was required to do, deprived Earp of the opportunity to establish prejudice. In any event, an award of damages on facts wholly different than those alleged in the cross-complaint establishes prejudice. Moreover, even were we able to excuse Harbor's failure to follow proper procedure, we would not be inclined to do so in this case, since the damage award was erroneous.

■ The damages awarded by the record represented, in large part, damages for the loss of use of the proceeds of the pending sale to 6-B. The damages which may be awarded in an action for disparagement of title do not include the loss of use of the money which would have been received if a prospective sale had been consummated. (See 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 901, pp. 3186-3187; Rest.2d Torts, § 633, esp. com. (i).) Further, the damage award was for the entire period during which Harbor was unable to complete its sale, yet a portion of the period was attributable to the lis pendens which was absolutely privileged. Any award of damages due to the extrajudicial communications must compensate only for the injury caused by those communications and may not compensate for the injury caused by the absolutely privileged recordation of the lis pendens.

For the above reasons the damage award against Earp must be reversed. ■ The reversal is without prejudice to Harbor to seek, by appropriate action, the damages to which it may be due, since no claim is lost by the failure to file a supplemental complaint setting forth a cause of action which occurred after the filing of the complaint. (3 Witkin, Cal. Procedure, *supra*, Pleading, § 1083, p. 2662.)

Earp does not contend that the evidence is insufficient to support the finding that he did not have a valid contract to purchase the Elk Grove Ranch from Harbor. We find substantial evidence to support that find-

ing and the judgment so declaring, and denying recovery to Earp on his complaint will be affirmed.

### THE APPEAL OF KOETITZ

### I

Koetitz contends that the trial court erred in permitting Harbor to introduce evidence of the oral condition placed upon the acceptance of the Earp offer by Nobmann that his acceptance would not be effective until the Harbor controller could review and approve the offer. Koetitz argues that the parol evidence rule renders such evidence inadmissible. The contention is without merit.

The parol evidence rule operates to bar extrinsic evidence which contradicts the terms of a written contract. (*Riley v. Bear Creek Planning Committee* (1976) 17 Cal.3d 500, 508 [131 Cal.Rptr. 381, 551 P.2d 1213].) "It 'is not a rule of evidence but is one of substantive law. It does not exclude evidence for any of the reasons ordinarily requiring exclusion, based on the probative value of such evidence or the policy of its admission. The rule as applied to contracts is simply that as a matter of substantive law, a certain act, the act of embodying the complete terms of an agreement in a writing (the 'integration'), *becomes the contract of the parties*. The point then is, not how the agreement is to be proved, because as a matter of law the writing is the agreement. Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself.' (Italics in original.) [Citations.]" (*Id.,* at pp. 508-509.)

From the above statement of the parol evidence rule it is clear that the rule relates to proof of the substance of an agreement, and not whether in fact an agreement was reached. As stated by Professor Corbin: ". . . it is certain that we need not begin excluding parol evidence until we know that a contract has been made." (3 Corbin, Contracts (1960) § 577, p. 385.) In California it has been consistently held that evidence may be introduced to establish that an agreement has not in fact been reached despite the fact that what appears to be a written contract has been introduced into evidence. (See Witkin, Cal. Evidence (2d ed. 1966) §§ 740, 741, pp. 686-687, and cases cited therein; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts §§ 106-107, pp. 108-109, and cases cited therein.)

In *Spade* v. *Cossett* (1952) 110 Cal.App.2d 782 [243 P.2d 799], a real estate broker sought to recover a commission for obtaining a purchaser for real property. The defendant argued that her signature on the offer was executed with the express agreement that it would not be effective unless her joint tenant husband also agreed to sell the property and that he had not done so. The Court of Appeal said: "This evidence was competent and relevant. It did not vary the terms of the writing. It was used to show that the writing never took effect as the embodiment of an obligation, upon the familiar principle that evidence is admissible to show that the parties never intended a writing to constitute a contract [citation] or that the taking effect of the contract depended upon a condition precedent. [Citations.]" (110 Cal.App.2d at p. 784. See also *Paratore* v. *Scharetg* (1942) 53 Cal.App.2d 710, 713 [128 P.2d 560].)

Koetitz attempts to avoid the effect of this rule by arguing that the condition placed upon the execution of the deposit receipt by Nobmann was a condition subsequent and not a condition precedent. We find, however, that the evidence amply supports the trial court's conclusion. Nobmann was not the owner of the property, Harbor was, and pursuant to corporate resolution it required the signatures of two officers in order for Harbor to enter into a contract to buy or sell real property. The approval of land deals by Brusco was important to Nobmann and Harbor. With this in mind Nobmann told Koetitz that since he had made a long trip down to bring the offer he would sign it, but on the express condition that he would have the opportunity to present it to Mr. Brusco for approval the following day. This is a classic condition precedent to the effectiveness of a written document and the trial court thus did not err in admitting the extrinsic evidence that an agreement for the sale of the ranch to Earp was not in fact entered into.

## II

Koetitz contends that he cannot be held liable to Harbor for damages which occurred due to Earp's assertion of a claim in the ranch. Koetitz was found liable for breach of an oral contract and for negligence. Since we find that the negligence cause of action supports the judgment we do not discuss the breach of contract cause of action. The negligence cause of action, however, must be discussed in detail due to the role Koetitz played as a real estate broker.

Liability for negligent conduct may be imposed only where there is a duty of care owed by the defendant to the plaintiff or to a class of

which the plaintiff is a member. (*J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 803 [157 Cal.Rptr. 407, 598 P.2d 60].) A duty of care may arise in various ways, but the concept of duty is simply a shorthand way of expressing whether the plaintiff's interests are entitled to protection against the defendant's conduct. (*Ibid.*) Courts in the past have been reluctant to find a duty of care, and hence a cause of action for breach of duty, against a person not in privity with an injured party for the mere negligent interference with prospective economic advantage. (See for example *Fifield Manor* v. *Finston* (1960) 54 Cal.2d 632, 636-637 [7 Cal.Rptr. 377, 354 P.2d 1073, 78 A.L.R.2d 813]; *Adams* v. *Southern Pac. Transportation Co.* (1975) 50 Cal.App.3d 37 [123 Cal.Rptr. 216], disapproved in part in *J'Aire Corp.* v. *Gregory, supra,* 24 Cal.3d at p. 807.) The Supreme Court, however, has repeatedly eschewed overly rigid common law formulations of duty in favor of allowing compensation for foreseeable injuries caused by a defendant's want of ordinary care. (*Id.,* at p. 805.) It is thus now clearly established that under proper circumstances a plaintiff may recover for negligent interference with prospective economic advantage despite the absence of privity of contract with the defendant. (*Ibid.*)

Harbor did not enter into a listing agreement with Koetitz for the sale of the Elk Grove ranch. Nevertheless it appears that Koetitz could properly be considered the contractual agent of either or both Earp and Harbor in the transaction in question. We do not believe that it is necessary, however, to determine whether Koetitz could be held to be in privity with Harbor because under the criteria set by the court in *J'Aire Corp.* v. *Gregory, supra,* we find that Koetitz owed a duty of care to Harbor.

In *J'Aire* a lessee brought an action against a contractor for negligence in failing to complete a construction contract within a reasonable time pursuant to a contract with the lessor. The Supreme Court found that a duty of care was owed, and set forth the appropriate criteria to be considered as follows: (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury suffered; (5) the moral blame attached to the defendant's conduct; and (6) the policy of preventing future harm. (24 Cal.3d at p. 804.)

The first three criteria all point strongly toward the finding of a duty of care. It is clear that the transaction was directly intended to affect Harbor and that harm was foreseeable as the result of Koetitz' negligence. It is likewise clear that Harbor suffered injury in being unable to complete transactions with its property due to the cloud on its title created by the claim made to the property by Earp. We must consider the closeness of the connection between Koetitz' actions and Harbor's injury.

Koetitz' negligent behavior was pervasive. He was aware that Harbor was insisting upon a price of $1,800 per acre for the ranch, yet he assisted Earp in preparing an offer that would only facially provide this price. The offer included the assignment of three unsecured, interest-only promissory notes bearing low rates of interest at face value without discounting to provide an actual value. If the offer were accepted as written Harbor would receive a purchase price far below the price Koetitz knew was demanded. Moreover, Koetitz was well aware that this was so.

Nobmann asked Koetitz to mail the offer to him, which would have permitted review of the terms of the offer by Harbor personnel before taking action, but Koetitz insisted on personally presenting it. When Nobmann reviewed the offer he asked Koetitz whether the promissory notes were adequate, and Koetitz assured him that unsecured promissory notes are better than secured promissory notes, a proposition the trial court found to be incredible. Nobmann approved the falsely inflated price in the offer, but desired to have the Harbor controller approve the terms and desired further to affect a tax-free exchange. He therefore agreed to the offer on the condition that Earp would agree to cooperate in affecting a tax-free exchange and further placed the condition upon his acceptance that he have until the next day to submit the offer to the Harbor controller.

Despite his own awareness of the unattractiveness of the offer, and his expressed surprise that Nobmann would approve it, Koetitz disregarded the condition that the offer first be approved by the Harbor controller and opened an escrow. When informed that the offer had not been approved he closed the escrow, but told Earp that the contract was valid and that the objections to it were just "typical lawyer talk." When Harbor continued to insist that it had not agreed to the offer Koetitz told Earp that their contentions were just "nit-picking" and that he had a valid contract.

From the above factual history it is clear that Koetitz' actions were closely connected with Harbor's injuries. He procured the instrument which was the basis for the false claim that Harbor had agreed to sell the ranch to Earp. Despite being in the best position to resolve the differences between Harbor and Earp he acted in utter disregard of the rights of Harbor and the potential injury to be suffered and continued to urge Earp forward with his false claim. Koetitz provided the sole basis upon which Earp could claim that he had an interest in the ranch, in that Earp was aware that the acceptance of the offer was conditional upon approval by Harbor's controller yet Koetitz continued to tell Earp that he had the "green light" to proceed. It is quite probable that had Koetitz at any time concerned himself with the rights of the others involved in the transaction rather than pursuing without pause his own personal profit the matter could have been resolved without resort to litigation and the injury to Harbor could have been avoided or minimized.

The moral blame attached to Koetitz' conduct is particularly acute. He was aware that under the Earp offer Harbor would receive far less for the property than it had continuously demanded yet he used everything in his power to force the deal upon Harbor. He was further aware of the damages being suffered by Harbor due to its inability to complete the transactions with 6-B and the Gassers, yet he continued in his harmful course of conduct. Moreover, due to the unique role he played as a real estate broker Koetitz was the one person that might have been able to resolve the dispute between Harbor and Earp, yet in utter disregard of their interests he chose the course which would result in personal profit.

Finally, we find that public policy supports a finding of a duty of care in these circumstances. Koetitz disclaims being a lawyer and giving legal advice or being an agent owing a fiduciary duty to Harbor. Nevertheless it is clear that Nobmann relied upon Koetitz in his dealings with Earp and the potential for harm was great. Under such circumstances Koetitz should have exercised at least reasonable caution in his dealings with Harbor.

We find that Koetitz had a duty of care towards Harbor and that the evidence supports the trial court's finding that the duty was breached. Koetitz contends, however, that his negligence was not the proximate cause of the injury to Harbor since it was Earp who made claim to the Elk Grove ranch and thus clouded the title. We disagree. An actor may

be liable if his negligence is a substantial factor in causing an injury, and he is not relieved of liability because of the intervening act of a third person if such act was reasonably foreseeable at the time of his negligent conduct. (*Vesely* v. *Sager* (1971) 5 Cal.3d 153, 163 [95 Cal.Rptr. 623, 486 P.2d 151].) Moreover, if the likelihood that a third person may act in a particular manner, whether innocent, negligent, intentionally tortious, or even criminal, is one of the hazards which makes the actor negligent the actor will remain liable for the harm caused by that negligence. (*Id.*, at 164.) The particular danger which arose from Koetitz' negligence was that Earp would assert a claim to the ranch and proceed as he did. Earp's actions were not a superseding cause of the injury to Harbor.

Koetitz argues that since Earp's actions were privileged he must also be protected by privilege. The contention is without merit. Koetitz was found liable to Harbor for negligence in his conduct as a real estate broker and his liability was not contingent upon liability of Earp. Moreover, nothing suggests that Koetitz should be protected from his own negligence merely because Earp engaged in some privileged activity.

## III

Koetitz contends that the damages awarded against him should not have included attorney's fees. We find that this case is controlled by the Supreme Court decision in *Prentice* v. *North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618 [30 Cal.Rptr. 821, 381 P.2d 645]. ▉ That decision noted that the general rule is that attorneys' fees are not recoverable in the absence of special agreement, statutory provision, or exceptional circumstance, but that the exception to the general rule is that: "A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred." (59 Cal.2d at p. 620.) The *Prentice* decision, which affirmed an award for the costs of clearing title, including attorneys' fees, against a negligent escrow holder, is directly on point and controlling in this action against a negligent real estate broker for the costs of clearing title.

Koetitz argues that a recent decision has limited the holding of *Prentice*. (See *Davis* v. *Air Technical Industries, Inc.* (1978) 22 Cal.3d 1, 6-7 [148 Cal.Rptr. 419, 582 P.2d 1010].) The cited decision involved an

action for implied indemnity by a seller of goods who was found strictly liable in a products liability case. The seller brought an action for indemnity against the manufacturer and included a request for attorneys' fees incurred in defending the prior suit. The Supreme Court found that the fees were incurred exclusively in defending against the allegations of the seller's own negligence and breach of warranty and hence were not recoverable in indemnity. (*Ibid.*) That decision is inapplicable because the trial court awarded only the portion of Harbor's attorneys' fees which were incurred in clearing title due to Koetitz' negligence, that portion of the fees which were incurred in prosecuting the cross-complaint for affirmative relief were segregated and not awarded.

Koetitz contends that attorneys' fees cannot be awarded because they were not plead. We hold, in the language of the court in *Prentice*: "However, the issue was thoroughly tried and understood by counsel and by the court, and no prejudice has resulted to [Koetitz] from a failure to allege the damage more specifically in the complaint." (59 Cal.2d at pp. 621-622.) Counsel stipulated that the matter of the attorneys' fees would be severed and heard by the court after the trial of the main action, and further stipulated to the trial of the matter by affidavit. We find no reversible error in this procedure.

Although we reject the contention that attorneys' fees were not properly awarded, we do find that an improper measure of damages was used. The sole evidence relating to damages was the estimate of Mr. Brusco. He presented two computations. In the first he multiplied the net proceeds to be derived from the sale of the ranch by the average interest Harbor paid on indebtedness for the period in question (15.12 percent), and arrived at a loss of $64,324. In the second computation Brusco multiplied the net proceeds after deducting the cost of satisfying the indebtedness secured by the ranch by the average interest rate and arrived at a loss of $30,015, to which he added the amount of interest actually paid on the prior indebtedness, that being $33,039, for a total loss of $64,015. Harbor additionally claimed $25,000 it paid to the Gassers to extend the contract to purchase their ranch, and the attorneys' fees incurred in clearing title.

■ It is fundamental that damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery. (*Engle* v. *City of Oroville* (1965) 238 Cal.App.2d 266, 272 [47 Cal.Rptr. 630].) ■ It was shown that as the result of the cloud upon its title to the property Harbor could not complete its sale to

6-B and was further precluded from completing the three-way exchange for the property of the Gassers. As a result Harbor was required to pay the Gassers $25,000 to extend the time for performance of their agreement, to incur expenses in clearing title to the Elk Grove ranch, and to continue making interest payments on its indebtedness secured by the Elk Grove ranch. These damages were certain and were properly awarded. The sum for the loss of the use of the remainder, computed at 15.12 percent per annum, finds no evidentiary support, however. No evidence was introduced to establish how the loss of the use of the funds either cost Harbor out of pocket expenses or resulted in lost profits. That portion of the judgment ($30,015) is not supported by the evidence. The judgment will accordingly be modified and affirmed as modified.

## IV

We finally address Koetitz' contention that he is entitled to his commission for arranging the contract between Earp and Harbor. This contention rests on the contention we have previously rejected that the court erred in admitting the extrinsic evidence that a valid contract was not entered into. Since we rejected that contention we also reject this one.

### CONCLUSION

The judgment is reversed insofar as it awards damages against Kenneth H. Earp, without prejudice to Harbor Properties, Inc. and W. G. Nobmann to pursue their claim for damages in further proceedings. Insofar as the judgment awards damages against Robert A. Koetitz it is modified to award the sum of $95,307.57, with interest in the amount of $404.17 from January 23, 1980, to the date of judgment. In all other respects the judgment is affirmed. Each party is to bear its own costs on appeal.

Blease, J., concurred.