[No. A015083. First Dist., Div. Two. Apr. 25, 1985]

BARBARY COAST FURNITURE COMPANY, INC., et al.,
Plaintiffs and Appellants, v.
ROBERT H. SJOLIE et al., Defendants and Respondents.

**[Opinion certified for partial publication\*]**

---

\*Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certified for publication, with the exception of issue III.

320

COUNSEL

Steven Kazan, William Barry Balamuth, Fonda Karelitz and Stark, Stewart, Wells & Robinson for Plaintiffs and Appellants.

Kurt W. Melchior, Severson, Werson, Berke & Melchior, Bernard J. Allard, Michael Ackerman and Popelka, Allard, McCowan & Jones, for Defendants and Respondents.

OPINION

ROUSE, J.—Plaintiffs Barbary Coast Furniture Company, Inc. (Barbary Coast) and Stuart and Carolyn Kadas appeal from a summary judgment in favor of defendant Daniel Cowans and two law firms of which he was a member.[1]

A. *The Complaint*

Plaintiffs' first amended complaint contained the following allegations pertinent to this appeal:[2] The first count alleged that on February 2, 1978, Barbary Coast[3] filed a chapter XI bankruptcy petition and that defendant Cowans acted as Barbary Coast's attorney in that proceeding. At the time of the commencement of the bankruptcy proceeding, Robert Sjolie was Barbary Coast's president and a member of its board of directors, and he and his family owned all of the common stock in Barbary Coast. On May 9, 1978, the bankruptcy court approved a plan of arrangement proposed by Barbary Coast and its counsel. It was further alleged that Barbary Coast had at all times engaged in the production and sale of furniture specially designed for the waterbed industry and that Sjolie, in his capacity as Barbary Coast's president and as a member of its board of directors, and Cowans, in his capacity as Barbary Coast's attorney, each had access to Barbary Coast's trade secrets and other confidential information, including Barbary Coast's customer list, special design concepts, production techniques and key personnel. It was also alleged that Sjolie and Cowans both owed continuing fiduciary duties to Barbary Coast and to its unpaid creditors and that in late 1978, while Barbary Coast's plan of arrangement was still being implemented, Sjolie and Cowans breached those fiduciary duties by forming a new corporation, Country Craft Woodworks, Inc. (Country Craft) which

---

[1]Subsequent references to "Cowans" herein shall be deemed to include these two law firms except where reference is being made to the individual actions of Daniel Cowans.

[2]It is unnecessary for the purposes of this appeal to summarize all of the allegations of the complaint, since some of them pertain only to defendants who are not parties to the appeal. This action was dismissed as against certain named defendants who entered into a settlement with plaintiffs. Those defendants include Robert Sjolie, Robert Yonts (and the law firm of which he was a member) and Country Craft Woodworks, Inc.

[3]Barbary Coast was known as Sjolie Enterprises until its corporate name was changed to Barbary Coast in February 1979. All references to "Barbary Coast" herein refer to the corporation both before and after the name change.

entered into direct competition with Barbary Coast. Country Craft was alleged to have (1) produced products with the same design concepts, ideas and techniques developed by Barbary Coast; (2) solicited Barbary Coast's customers by offering to sell its products to them; and (3) induced key personnel of Barbary Coast to leave their jobs with Barbary Coast and go to work for Country Craft. Defendant Cowans allegedly owned 50 percent of Country Craft's common stock and was chairman of its board of directors. Sjolie was Country Craft's president. It was alleged that defendant Cowans' involvement with Country Craft had resulted in the following breaches of the fiduciary duty which he owed to Barbary Coast: (1) participating in a business in direct competition with Barbary Coast; (2) impairing Barbary Coast's ability to pay its creditors pursuant to the plan of arrangement; (3) failing to fully disclose his participation in a competing business; (4) acting contrary to the interests of Barbary Coast; and (5) using in a rival business confidential information obtained during his representation of Barbary Coast.

The second count of the complaint reincorporated the factual allegations of the first count and further alleged that defendant Cowans had breached his duties as an attorney and agent of Barbary Coast and had failed to act in good faith and to protect Barbary Coast's best interests when he participated in a rival business after having negotiated, prepared and obtained confirmation of Barbary Coast's plan of arrangement.

The third count of the complaint purported to state a cause of action on behalf of plaintiffs Stuart Kadas and his wife, Carolyn. It was alleged that during the 60-day period prior to the confirmation of Barbary Coast's plan of arrangement by the bankruptcy court on May 9, 1978, defendants Sjolie and Cowans conspired together and, pursuant to that conspiracy, used fraudulent misrepresentations and concealments in order to induce plaintiffs Kadas and a second couple named Thomas to purchase two-thirds of the stock in Barbary Coast from defendant Sjolie for the sum of $70,000. Specifically, Sjolie and Cowans were charged with having made the following misrepresentations to plaintiff Stuart Kadas: (1) Sjolie would cooperate and work with Kadas, using his sales contacts, marketing and production abilities and his best efforts to make Barbary Coast a sound and profitable corporation; (2) Barbary Coast would be a successful business; (3) Barbary Coast's creditors would be paid pursuant to the proposed plan of arrangement; (4) 70 percent of the face value of Barbary Coast's outstanding accounts receivable were collectible; and (5) Sjolie would do nothing to interfere with Barbary Coast's successful operation and its financial ability to meet its obligations. Also, Sjolie and Cowans were alleged to have concealed or omitted to inform Kadas of the following material facts: (1) that Sjolie and Cowans intended to establish a corporation which would engage in direct competi-

tion with Barbary Coast; (2) that they would solicit Barbary Coast's customers and divert business from Barbary Coast; (3) that they would use confidential information obtained from Barbary Coast for their own benefit and enrichment; (4) that they intended to pirate key employees from Barbary Coast; and (5) that only 30 percent of the face value of Barbary Coast's accounts receivable were collectible.

In the fourth count of the complaint, as an alternative theory of recovery, plaintiffs Kadas alleged that the material misrepresentations and omissions charged in the third count were the result of negligence, rather than fraud, on the part of Sjolie and Cowans.

The fifth count of the complaint alleged that defendants had formed and carried out an intentional plan to appropriate Barbary Coast's business for themselves through the use of Barbary Coast's trade secrets and confidential information. This unfair competition by defendants was alleged to have deprived Barbary Coast of many customers who would otherwise have continued to patronize it.

The sixth and final count of the complaint alleged that defendants' wrongful acts had been performed pursuant to a conspiracy between defendants to injure and destroy Barbary Coast's business and plaintiff Kadas' investment therein and to appropriate Barbary Coast's business for defendants.

Plaintiffs Barbary Coast and Kadas prayed for actual damages in an amount over $700,000 and punitive damages in an amount over $1 million.

## B. *The Answer*

In his answer to the complaint, defendant Cowans took the position that he had agreed to represent Barbary Coast for the sole purpose of obtaining approval of Barbary Coast's plan of arrangement from the bankruptcy court and that, once such approval was obtained, Cowans' fiduciary duties to Barbary Coast and its creditors had ceased to exist. Cowans admitted that he and codefendant Sjolie had formed Country Craft, that they were both members of its board of directors and that Cowans owned 50 percent of Country Craft's stock. However, Cowans denied having engaged in any wrongful or tortious conduct and he likewise denied that Barbary Coast had been damaged in any amount.

In response to the Kadases' purported causes of action, defendant Cowans admitted that Sjolie and his family owned all the stock in Barbary Coast when the bankruptcy proceeding was commenced, and Cowans also admitted that plaintiffs Kadas had purchased stock in Barbary Coast. However,

Cowans denied all the allegations to the effect that material facts had been misrepresented or concealed, either fraudulently or negligently, and likewise denied that plaintiffs Kadas had been damaged in any amount.

Defendant Cowans also raised a number of affirmative defenses, including the allegation that plaintiffs had expressly consented to competition by defendant Sjolie and had thereby abandoned any right to claim unfair competition.

### C. *The Summary Judgment Motion*

On August 19, 1981, Cowans filed a motion for judgment on the pleadings as to the first four counts of the first amended complaint, for summary judgment as to all counts of the complaint and, in the alternative, for a summary adjudication of certain issues. Pursuant to this latter request, Cowans sought to have it adjudicated that (1) plaintiffs Kadas were not entitled to base any claim against Cowans upon his conduct while representing Barbary Coast in the bankruptcy action because such conduct was absolutely privileged; (2) Cowans owed no duties which, if breached, would subject him to tort liability under the State Bar Rules of Professional Conduct applicable to attorneys or otherwise; and (3) that by virtue of having entered into a consulting agreement with Sjolie, plaintiffs Kadas were estopped from complaining of any conduct specifically or impliedly authorized by that agreement.

Plaintiffs Barbary Coast and Kadas filed a lengthy memorandum of points and authorities in which they opposed the granting of any of the relief requested by Cowans.

Both sides also filed various declarations and excerpts from depositions, as well as letters and a contract, supportive of their respective positions.

Through the deposition testimony of plaintiff, Stuart Kadas, defendant Cowans established that, prior to investing in Barbary Coast, Kadas had been one of its largest creditors and that he served as chairman of the creditors' committee in the bankruptcy proceeding.

Defendant Cowans also established that on December 29, 1978, after Stuart Kadas had invested in Barbary Coast, that corporation entered into a written one-year contract with Robert Sjolie, whereby Sjolie was to make himself available as a consultant to Barbary Coast, when requested, if his own full-time employment in other business endeavors permitted him to do so. This contract obligated Sjolie to "refrain from any direct or indirect involvement in any business enterprise which manufactures and/or distrib-

utes the exact same rustic stained only pine waterbed frames, headboards and related bedroom furniture." The agreement further provided that Sjolie acknowledged and Barbary Coast was thereby informed that Sjolie "does plan to be involved in a business that does manufacture other various styles of waterbed frames, headboards and related bedroom furniture." This agreement was signed by Sjolie and by Stuart Kadas in his capacity as chairman of Barbary Coast's board of directors.

Cowans also relied upon deposition testimony by Charles Greene, who was Stuart Kadas' attorney and who had drafted the aforementioned consultant agreement. At his deposition, Greene stated that he had drafted the consultant agreement after attending a meeting with Sjolie and Mr. Kadas. According to Greene, although Kadas and Sjolie were initially talking in terms of a provision prohibiting all competition by Sjolie, Greene advised them that any such provision would be unenforceable unless it was more narrowly drawn. After further discussion, it was orally agreed by Kadas and Sjolie that the latter would only be prohibited from making and selling the same rustic stained line of furniture which he had previously made at Barbary Coast and that he would be free to make and sell lacquered waterbed furniture.

Cowans also relied upon his own deposition testimony to the effect that his "own personal involvement" in Barbary Coast's bankruptcy proceeding had probably ended in the summer of 1978 and that the younger attorneys at his firm had handled the remaining work, which was largely administrative.

Plaintiffs marshalled considerable documentation in support of their position. In a declaration executed by Stuart Kadas, he averred that he had supplied Barbary Coast with wooden bed frames in 1977 and 1978 and had therefore been one of its creditors when the bankruptcy proceeding was filed in February 1978. According to Kadas, Cowans was Barbary Coast's attorney of record from the inception of the bankruptcy proceeding until August 1980, when he withdrew as Barbary Coast's attorney of record after one of the creditors had filed a motion to force the company into straight liquidation. Kadas averred that during the early stages of the chapter XI proceeding, attempts had been made to persuade two specified companies to finance a plan of arrangement for Barbary Coast. When these attempts failed, Cowans asked Kadas if he could provide the necessary financing, and, thereafter, various negotiations took place between Kadas, Cowans and Sjolie. Kadas averred that, during these negotiations, Sjolie and Cowans represented to him that 70 percent of the face value of Barbary Coast's outstanding accounts receivable were collectible; that Barbary Coast's inventory was worth $200,000; that Barbary Coast's creditors would be paid pursuant to

the proposed plan of arrangement; that Barbary Coast would be a successful business; and that Sjolie would use his best efforts to make Barbary Coast a sound and profitable corporation. Kadas averred that it was in reliance upon these representations that he purchased stock in Barbary Coast.

Kadas further averred that, had he been aware of the content of a letter which Cowans had written to a San Jose bank in December 1977, commenting upon Barbary Coast's dire financial prospects, he would never have invested in Barbary Coast. According to Kadas, Cowans not only failed to advise him of the contents of this letter, but, on several occasions prior to his stock purchase, assured him that with Sjolie's design and manufacturing abilities and Kadas' abilities in the front office, Barbary Coast would be successful. Kadas averred that Cowans formed Country Craft with Sjolie in late 1978, while Barbary Coast's plan of arrangement was still being implemented, but that Kadas did not learn of Cowans' participation in Country Craft until November 1979. In the meantime, in late 1978, Country Craft had hired away virtually all of Barbary Coast's key personnel and supervisors. Kadas averred that, in addition to Sjolie, Barbary Coast's former president and head of manufacturing, the pirated employees included Barbary Coast's supervisor of furniture assembly, its production manager, its chief bookkeeper and its supervisor of face frames and cutting. According to Kadas, Barbary Coast was then left almost entirely without experienced supervisors and personnel to staff its manufacturing operations.

Kadas further averred that "The Bedroom" was Barbary Coast's major customer in late 1978, but that immediately after Country Craft became operational, it began to solicit business from The Bedroom and from Barbary Coast's other major customers. According to Kadas, the products of Barbary Coast and Country Craft were highly competitive and were both displayed in the same showroom by The Bedroom, thereby appealing to the same customers.

Kadas averred that during the period between November 6, 1978, when Sjolie resigned from Barbary Coast, and December 29, 1978, when the consulting agreement and agreement for the purchase of Barbary Coast stock were executed, Sjolie misrepresented to Kadas that his new business would not compete with Barbary Coast; that it would be a small operation in the Morgan Hill area; and that it would not hire any of Barbary Coast's employees. Finally, Kadas averred that Sjolie had breached the consulting agreement and that, although Kadas had told Sjolie on several occasions that Barbary Coast's key personnel had left the company and that Kadas himself lacked the expertise to run the manufacturing phase of the business, Sjolie had refused to consult with Kadas.

Plaintiffs also relied upon a declaration by Charles Greene, Kadas' attorney. Greene averred that in the fall of 1978, after Sjolie had announced his intention to resign as president of Barbary Coast, Greene attended a meeting between Kadas and Sjolie which was held for the purpose of determining whether they could decide upon an amicable basis for Sjolie to sell his stock in Barbary Coast and thereafter continue to assist Barbary Coast in the capacity of a consultant. According to Greene, Sjolie represented that he was leaving Barbary Coast because he was tired and burned out and wanted to spend more time with his family. Although Sjolie did state that he intended to continue manufacturing waterbeds, he explained that he intended to run a small operation in the Morgan Hill-Gilroy area and that it would not be a threat to Barbary Coast. Greene reaffirmed Kadas' averment that Sjolie told Kadas that he would not take any of Barbary Coast's employees for his new company. According to Greene, Sjolie assured him that he would not compete with Barbary Coast and repeatedly stated that the consultant agreement need not be specific because the two companies would not be competitive and that Sjolie's company would be much smaller, both in terms of its marketing area and its physical size. Greene averred that he did not learn of Cowans' participation in Sjolie's new business until over a year later, and that he was shocked to learn of this participation since it had taken place while Cowans was still Barbary Coast's attorney of record in the bankruptcy proceeding.

Through an excerpt from Cowans' deposition, plaintiffs established that it was not until August 1, 1980 that he wrote to Mr. Kadas and formally withdrew as Barbary Coast's attorney in the bankruptcy proceeding. In his deposition, Cowans also admitted that he had never advised Stuart Kadas of his intention to participate in Sjolie's new business and to invest $25,000. During his deposition, Cowans did state that, in November 1978, prior to investing that sum, he and Sjolie had met with the individual in charge of the "Comfort Zone," another retailer with which Barbary Coast had done business, and had satisfied himself that it was a sellers' market in the waterbed industry and that the Comfort Zone might be interested in buying products from Sjolie's new company. Cowans also admitted that he was aware in 1979 that Country Craft was doing 70 percent of its business with The Bedroom and that he had known before he invested in Country Craft, that The Bedroom was one of Barbary Coast's customers.

Plaintiffs also relied upon deposition testimony by Sjolie, who admitted attending a meeting with Kadas and Greene and assuring Greene that there would be no problem with competition because he (Sjolie) did not intend to compete with Barbary Coast. Sjolie also testified that before Cowans invested in Country Craft, Sjolie introduced him to one of the owners of The Bedroom and Cowans asked that individual whether The Bedroom might be

willing to do business with Sjolie's new company and received an affirmative response.

Answers to interrogatories propounded to Country Craft and Sjolie indicated that in 1979, Country Craft's gross sales to The Bedroom were $232,714.24 and that its gross sales to the Comfort Zone in that year were $19,154.

Plaintiffs also relied upon a letter which defendant Cowans had written on December 8, 1977 to a vice-president of The First National Bank of San Jose, one of Barbary Coast's major creditors. In that letter, Cowans commented upon his December 6 meeting with various officers of the bank and his impression that their observations regarding Barbary Coast were so negative that there was no likelihood of the bank's continuing to participate while Barbary Coast attempted to solve its financial difficulties. Cowans then went on to state, "I quite agree with you that additional capital would be most desirable. The picture you painted is so bleak, however, that it does not seem worthwhile . . . . You suggested that it would be a long time, perhaps five or six years, before an investor could look to anything in the way of return on his investment and indicated that your investigation has revealed that no bank or commercial finance company would be interested. In light of that, Mr. Sjolie and I are not inclined to seek any infusions of capital. It would be ludicrous to ask people to invest merely for the purpose of making your liquidation more comfortable for you."

### D. *The Trial Court's Decision*

On September 21, 1981, based upon its review of the above documentation, the trial court rendered an order granting summary judgment in favor of defendant Cowans and against plaintiffs Barbary Coast and Kadas. The trial court found the following facts to be true: Cowans was Barbary Coast's attorney in the chapter XI proceeding, and Barbary Coast was essentially a one-man operation by Sjolie. In the same year as the bankruptcy reorganization, 1978, Sjolie organized a new corporation, Country Craft, and began producing lacquered waterbed furniture and selling it to companies which included prior customers of Barbary Coast. Cowans invested in Country Craft "while he was attorney for the debtor in reorganization." Defendant Stuart Kadas was a creditor of Barbary Coast and at one time chairman of its creditors' committee, and he bought a controlling interest in Barbary Coast as a part of the reorganization. At the time of this purchase, Kadas signed a consulting agreement with Sjolie which permitted Sjolie to manufacture and sell any type of waterbed furniture other than the rustic stained variety in which Barbary Coast had specialized.

The court then reached the following conclusions: Cowans did owe a fiduciary duty to his client, Barbary Coast, but he did not breach that duty by investing in a "non-competitive" venture which was expressly permitted by the consultant agreement between Barbary Coast and Sjolie. Plaintiffs Barbary Coast and Kadas were bound by that agreement. The agreement in question was, by its own terms, unenforceable, and, in the court's opinion, "all it amounts to is a division of the market—plaintiff gets an exclusive in rustic stained pine waterbed frames . . . and Sjolie is free to produce, sell and compete in all *other* types."

Cowans had no fiduciary duty to Kadas, who was always an adverse party, and Cowans had no obligation to inform Kadas of his participation in Sjolie's new business venture. Kadas knew that since Barbary Coast was in bankruptcy, it was in financial trouble. Although Cowans was liable to Kadas for fraudulent conduct which induced Kadas' stock purchase, "no fraud, no lies, no misrepresentations have been shown as to Cowans."

On October 9, 1981, a judgment was accordingly rendered that plaintiffs Barbary Coast and Kadas take nothing from defendant Cowans.

## I.

It is well settled that a motion for summary judgment may be granted only where the affidavits or declarations of the moving party, even when strictly construed, would be sufficient to sustain a judgment in his favor, and those of his opponent, when liberally construed, are insufficient to raise a triable issue of fact. (*Wilson* v. *Bittick* (1965) 63 Cal.2d 30, 34-35 [45 Cal.Rptr. 31, 403 P.2d 159].)

On appeal from a summary judgment in favor of the defendant, the appellate court "need only determine whether there is a reasonable *possibility* that plaintiff may be able to establish its case. When the moving party is the defendant, he must conclusively negate a necessary element of plaintiff's case or establish a complete defense, and thereby demonstrate that under no hypothesis is there a material factual issue which requires the process of a trial." (*Tresemer* v. *Barke* (1978) 86 Cal.App.3d 656, 661-662 [150 Cal.Rptr. 384, 12 A.L.R.4th 27].)

The cardinal principle governing summary judgments is that a court ruling upon such a motion may not pass upon the issues themselves: if a single material issue of fact is found, the trial court is powerless to grant a motion for summary judgment and must allow such issue to be tried. (*Jos. Schlitz Brewing Co.* v. *Downey Distributor* (1980) 109 Cal.App.3d 908, 914 [167 Cal.Rptr. 510].)

## II.

■ Plaintiffs' first contention on appeal is that the trial court incorrectly applied the principles governing summary judgments. They correctly point out that the basis for the trial court's ruling against Mr. and Mrs. Kadas was that defendant Cowans had not behaved fraudulently toward the Kadases. Although the court concluded that defendant Cowans *was* liable for any fraudulent conduct which had induced the Kadases' stock purchase, the court found that "no fraud, no lies, no misrepresentations have been shown as to Cowans." Plaintiffs now contend that this determination by the trial court constituted an improper resolution of a disputed factual issue which should only have been decided at trial and not by way of a summary judgment motion.

In response to this argument, defendant Cowans concedes that, for the purposes of this appeal, it must be assumed that he did make the various fraudulent statements which plaintiffs attribute to him. However, he claims that the statements in question are not actionable in this instance because they were made in the context of a judicial proceeding and are therefore absolutely privileged under section 47, subdivision 2, of the Civil Code. Cowans takes the position that if the granting of summary judgment against plaintiffs Kadas was correct on any ground, it must be upheld even though the trial court relied upon the wrong reasons for its ruling.

■ We agree that the trial court's decision to grant summary judgment against plaintiffs Kadas must be upheld if correct on any ground. In the early case of *Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117], the California Supreme Court pointed out that "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." (To the same effect, see *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].) However, we do not agree with defendant Cowans' claim that his alleged conduct with regard to plaintiffs Kadas was absolutely privileged.

Section 47 of the Civil Code provides, in pertinent part, that "A privileged publication or broadcast is one made—. . . 2. In any . . . (2) judicial proceeding . . . ." This privilege was originally limited to defamation actions. (See *Block* v. *Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386, 389 [182 Cal.Rptr. 438].) However, in the landmark case of *Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 378, 380-381 [295 P.2d 405], the Califor-

nia Supreme Court held that the absolute privilege created by section 47, subdivision 2, applied to the defendant's conduct in filing a lis pendens even though it was alleged that the defendant knew at the time that he had no right to any lien on or interest in the plaintiff's real property. The court held that the privilege "is not limited to the pleadings, the oral or written evidence, to publications in open court or in briefs or affidavits. If the publication has a *reasonable relation* to the action and is permitted by law, the absolute privilege attaches." (P. 381; italics added.)

The absolute privilege created by section 47, subdivision 2, has subsequently been held to apply in a wide variety of situations (see *Block* v. *Sacramento Clinical Labs, Inc., supra,* 131 Cal.App.3d 386, 390-391.) *Pettit* v. *Levy* (1972) 28 Cal.App.3d 484 [104 Cal.Rptr. 650], and *Portman* v. *George McDonald Law Corp.* (1979) 99 Cal.App.3d 988 [160 Cal.Rptr. 505], are illustrative of the extremely broad and all-inclusive interpretation which some courts have extended to the privilege. In *Pettit, supra,* the privilege was held applicable to the allegedly fraudulent filing of a false and forged building permit with the City of Fresno. (Pp. 488-489.) Although it was alleged that the defendants had engaged in this wrongful conduct in order to injure the plaintiffs and deprive them of the use of their property, the appellate court held that the applicable test in determining whether the privilege applied was not whether the publication was relevant and material "in a technical sense" to the zoning proceedings before the city, but whether it had "some connection or relation" to those proceedings. (P. 489.) The court held that since the filing of the forged permit had caused a denial of the plaintiffs' application for a variance, it followed that the defendants' wrongful conduct met the relationship test. (*Ibid.*) Although the *Pettit* court expressed its concern over the fact that it was insulating from liability individuals allegedly guilty of heinous conduct, the court concluded that "any narrowing of the privilege to redress this grievance would produce mischiefs far worse." (P. 492.)

Similarly, in *Portman, supra,* 99 Cal.App.3d 988, the appellate court encountered no difficulty in holding that the privilege applied to the conduct of attorneys who had falsely represented the financial soundness of their client to the decided disadvantage of the opposing party. In that case, the defendant attorneys had represented a corporation against whom the plaintiffs had obtained a money judgment. (P. 989.) The corporation appealed from the judgment and the defendants, in their capacity as attorneys for the corporation, attempted to dissuade the plaintiffs from filing an undertaking to stay enforcement of the judgment on appeal. (*Ibid.*) To this end, the defendants falsely assured the plaintiffs that the corporation was "'financially as sound as a dollar,'" although the corporation was, in fact, insolvent at that time and was later forced into receivership. (*Ibid.*) The appellate

court held that this misrepresentation was absolutely privileged, since it had "some connection or relation" to the lawsuit between the plaintiffs and the corporation. (P. 991.)

Other courts have applied a more restrictive interpretation to section 47, subdivision 2, of the Civil Code. In *Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818 [106 Cal.Rptr. 718], the question before this court was whether the absolute privilege applied in a situation where it was alleged that during and after the pendency of a prior civil action, the defendants had made various statements accusing one of the litigants and some of the attorneys in the action of manufacturing evidence and suborning perjury. (P. 822.) In determining the application of the privilege, we placed considerable emphasis upon the obvious purpose of section 47 to afford litigants freedom of access to the courts and to promote the unfettered administration of justice. (P. 823.) We emphasized the fact that the absolute privilege should be confined to cases in which the challenged publication was *"made in furtherance of the litigation and to promote the interest of justice."* (P. 826.) We concluded that there was nothing to suggest that the defendants had made the challenged publication to achieve the objects of the litigation, and that, to the contrary, it appeared that the publication in question was made for the sole purpose of bringing it within the protective shield of the absolute privilege in order that it could be spread with impunity. (P. 826.) We further stated, "[i]t is easily discernible what result would ensue should we condone such an apparent ruse by providing absolute immunity to the resourceful slanderer. The privileged defamation, now a barely tolerated exception, would gain full-fledged legitimization. All that the slanderer would have to do to avoid the consequences of his evil act would be to file the defamatory matter with the court first, then republish it as an absolutely privileged matter to the news media or to the public at large, thereby converting the litigation in the court into litigation in the press or in the street." (P. 826.)

The reasoning of the *Bradley* case was recently followed in *Earp* v. *Nobmann* (1981) 122 Cal.App.3d 270 [175 Cal.Rptr. 767]. In that case, plaintiff Earp brought a specific performance action against defendant Harbor Properties, Inc. (Harbor) although he had no basis for believing that he had entered into a valid contract to purchase Harbor's real property. (Pp. 278-280.) Upon commencing the action, Earp also filed a lis pendens which had the effect of preventing Harbor from completing a contemplated sale of the property to a third party, the 6-B Cattle Company (P. 280.) Since the lis pendens made it impossible for Harbor to obtain title insurance, the Federal Land Bank refused to consider 6-B's loan application. (P. 280.) Harbor ultimately moved to expunge the lis pendens, and the trial court denied the motion on the condition that Earp post a $300,000 bond within five working

days. (*Ibid.*) When Earp chose not to do so, the lis pendens was expunged. (Pp. 280-281.) However, Earp's attorneys then wrote to the Federal Land Bank and to 6-B's real estate agent and advised them that Earp still claimed an interest in Harbor's real property and that if 6-B attempted to purchase that property, it would take subject to Earp's interest therein. (P. 281.) As a result of these communications, Harbor remained unable to obtain title insurance and 6-B remained unable to obtain a loan to purchase the property from Harbor. (*Ibid.*)

The appellate court held that although the filing of the lis pendens by Earp was absolutely privileged under section 47, subdivision 2, of the Civil Code, his subsequent conduct in communicating with the Federal Land Bank and 6-B's real estate agent was not. (Pp. 282-285.) After quoting at length from our *Bradley* decision (pp. 283-284), the appellate court held that Earp's actions were not intended to further the litigation and to promote justice, but rather were intended to circumvent a judicial determination with which he was unhappy and to impede the interests of justice implicit therein. Under such circumstances, the court found that Earp's extrajudicial communications were not absolutely privileged under section 47, subdivision 2, of the Civil Code. (Pp. 284-285.)

 This case presents us with the opportunity to reevaluate the divergent views concerning the proper interpretation to be accorded the absolute privilege created by section 47, subdivision 2, of the Civil Code. Such analysis leads us to conclude that the more narrow construction which we espoused in *Bradley* and which was reaffirmed in *Earp* should prevail. In essence, we cannot accept the analysis of the court in *Pettitt* v. *Levy, supra,* 28 Cal.App.3d 484, 492, that heinous conduct must be condoned lest greater mischiefs occur, whereas we can and do endorse the *Bradley* reasoning that an overly broad construction of section 47, subdivision 2, is bound to encourage wrongful conduct immune from judicial redress. (*Bradley* v. *Hartford Acc. & Indem. Co., supra,* 30 Cal.App.3d 818, 826.)

When the *Bradley* reasoning is applied to this case, it becomes apparent that the summary judgment against plaintiffs Kadas cannot be upheld on the ground that defendant Cowans' conduct was absolutely privileged. Assuming, as we must, that Cowans did make the various misrepresentations which plaintiffs have attributed to him, the situation is one where Cowans misrepresented Barbary Coast's present worth, its financial prospects, and the assistance it would receive from Sjolie, for the only apparent purpose of extricating Sjolie from his involvement with Barbary Coast in order that he and Cowans would be free to establish a competing business. In his deposition, Cowans testified that the purpose of a chapter XI proceeding is to rehabilitate the debtor, in this instance Barbary Coast. Yet, Cowans' 1977

letter to a San Jose bank made it abundantly clear that, at that point in time, Cowans was well aware that Barbary Coast's rehabilitation was not a viable possibility, even without the competition which Cowans allegedly intended to create. Under these circumstances, Cowans' alleged misrepresentations to the Kadases cannot be viewed as having been made in furtherance of the chapter XI proceeding and to promote the interest of justice; hence his claim of absolute immunity under section 47, subdivision 2, of the Civil Code must fail. It follows that the trial court erred in granting summary judgment in favor of defendant Cowans and against plaintiffs Kadas.[4]

III.*

. . . . . . . . . . . . . . . . . . . . . . .

The judgment is reversed.

Kline, P. J., and Smith, J., concurred.

A petition for a rehearing was denied May 22, 1985, and respondents' petition for review by the Supreme Court was denied August 1, 1985. Bird, C. J., Mosk, J., and Reynoso, J., were of the opinion that the petition should be granted.

---

[4]In a footnote in his respondent's brief on appeal, defendant Cowans suggests that even if the absolute privilege created by section 47, subdivision 2, should be held inapplicable, the summary judgment may nevertheless be upheld because the trial court correctly determined that Cowans had made no actionable misrepresentations to plaintiffs Kadas. Cowans asserts that once he moved for summary judgment, it became plaintiffs' duty to point to evidence in support of the allegations of their complaint.

This argument is without merit. One need look no further than Stuart Kadas' declaration to find such support for the misrepresentations attributed to defendant Cowans. (See *ante,* pp. 326-327.)

*See footnote, *ante,* page 319.