[No. B038456. Second Dist., Div. Seven. Jan. 30, 1990.]

MATHEW ABRAHAM, Plaintiff and Appellant, v.
LANCASTER COMMUNITY HOSPITAL et al., Defendants and
Respondents.

COUNSEL

Sheppard, Mullin, Richter & Hampton, Richard P. Sybert, Kent R. Raygor, Perry J. Viscounty and Polly Towill Dennis for Plaintiff and Appellant.

Coppo & Cosgrove, Horvitz & Levy, David M. Axelrad, Rosalyn S. Zakheim, Vogt, Sanchez & Meadville and Carole S. Khan for Defendants and Respondents.

OPINION

WOODS (Fred), J.—

## I.

### INTRODUCTION

Appellant, Mathew Abraham, hereafter Abraham, appeals from an order of dismissal following the sustaining of respondents' demurrer without leave to amend. Abraham's action in the superior court emanates from allegations made about him by the respondents in a lawsuit in the United States District Court. We conclude that the allegations complained of are protect-

ed by the absolute privilege found in Civil Code section 47, subdivision 2 and affirm the judgment of dismissal.

## II.

### PROCEDURAL AND FACTUAL SYNOPSIS

A. *The Underlying Federal Action*

1. *Original Complaint in Federal Court.*

On February 3, 1987, Lancaster Community Hospital, hereafter LCH, filed a complaint in the United States District Court for the Central District of California. Damages, as well as declaratory and injunctive relief were sought based upon causes of action on the following legal theories: antitrust violations, interference with contractual relationships, and interference with prospective economic advantage.[1] The named defendants in the initial complaint of the underlying federal action were Antelope Valley Hospital Medical Center, hereafter Antelope; Maxicare Health Plan; Blue Cross of California; and Sierra Primary Care Associates, hereafter Sierra.

2. *Proposed First Amended Complaint in Federal Court.*

LCH subsequently moved for leave to amend its complaint in the United States District Court in November of 1987. LCH's proposed first amended complaint in the federal action sought damages and injunctive relief arising from alleged violations of California and United States antitrust laws, the Racketeer Influenced and Corrupt Organizations Act (RICO), and the common law. Named defendants included Abraham; the Antelope Valley Hospital District, hereafter AVHD; Antelope Valley Medical Group, Inc., hereafter Medical Group; John H. Lynn; Antelope Valley Health Ventures; Antelope Valley Dialysis Center; and Blue Cross of California. Maxicare Health Plan (hereafter Maxicare) and Sierra Primary Care Associates, another respondent in this appeal, were mentioned in the body of the proposed first amended complaint as coconspirators.

---

[1] This initial complaint filed in the federal court apparently was not part of the record in the instant superior court action and consequently not part of the record on appeal. We take judicial notice of their initial federal complaint, however, which is attached as an appendix to the brief of respondents, LCH and Paracelsus Healthcare Corporation, pursuant to Evidence Code sections 452, subdivision (d), and 459.

3. *Relevant Allegations Against Abraham in the Proposed First Amended Complaint.*

It is alleged that Abraham's responsibilities as assistant administrator of Antelope include oversight of the hospital's contracting with alternate delivery systems and third party payors. "Abraham is also responsible for overseeing [Antelope's] relationships with defendants [Medical Group] and Antelope Valley Dialysis Center, and for overseeing the activities of defendant Antelope Valley Health Ventures."

Antelope is alleged to be the only hospital in a certain area providing perinatal services, but is one of four hospitals, including LCH, providing inpatient medical/surgical services.

It is alleged that "Abraham and [Antelope] have exploited [Antelope's] market power and monopoly power over perinatal services to coerce private payors to purchase inpatient medical/surgical services from [Antelope] and to inflict competitive injury upon [LCH]."

According to LCH's proposed first amended complaint, during the year 1985, Abraham, Antelope, and AVHD caused the Medical Group to be organized and to affiliate with Antelope and no other hospital.[2] Various defendants, including Abraham, agreed Antelope should not contract with Maxicare unless Maxicare entered into a business relationship with the Medical Group. Through these and other devices, defendants forced Maxicare into an agreement whereby at least 51 percent of Maxicare's medical/surgical patients would be admitted to Antelope or Maxicare's contract with Antelope would "automatically terminate." Maxicare in turn notified Sierra that Sierra was to refer Maxicare enrollees to Antelope whenever possible; Sierra did so. The overall effect was to dissuade medical/surgical patients from patronizing LCH.

Similarly, Abraham, AVHD and Antelope were alleged to have exerted pressure on Blue Cross to divert its enrollees from LCH to Antelope; as a result, Blue Cross terminated its agreement with LCH and entered into an exclusive contract with Antelope. The defendants are further alleged to have insisted other private payors wishing to use Antelope's perinatal

---

[2] The proposed first amended complaint further alleged the relationship with the Medical Group involved the misappropriation of public funds in that Abraham and others transferred assets from AVHD and Antelope to assist the Medical Group. Such assistance allegedly included allowing Abraham, a full-time employee of Antelope whose entire salary is paid by Antelope, to devote substantial amounts of his time to conducting business for the Medical Group. The Medical Group's application to change from a for-profit to a nonprofit entity was alleged to be wrongful in that one of the Group's primary goals "is to secure substantial economic benefits for its physician members."

services must "guarantee that all or most of their medical/surgical patients be directed to [Antelope] as well."

The proposed LCH complaint alleged Antelope has thus been able to pressure others to use its medical/surgical services over those of LCH even though Antelope's charges for perinatal service "are now and have been substantially above levels charged for such services in markets where competition exists." When questioned about recent increased charges, Mr. Abraham allegedly responded "that the rate is 'not negotiable' and that 'if you don't like the rates, take your babies by helicopter somewhere else.' " Other alleged statements by Abraham further demonstrate Antelope's "predatory, anticompetitive and monopolistic intent": " 'You have to deal with me to practice [medicine] here' "; " 'I will bring Maxicare to their knees just like I brought Kaiser [Kaiser Permanente—another health maintenance organization] to their knees' "; " 'I control health care in the [Antelope] Valley' "; and " 'If you don't want to use Antelope Valley's [perinatal services], drop a few babies along the freeway—like Kaiser—and see what that does to your reputation.' "[3]

The proposed LCH complaint alleged further that Antelope has attempted to acquire LCH and Palmdale Community Hospital, "the only hospitals in the relevant geographic market which pose substantial competition to [Antelope] in the market for inpatient medical/surgical services for private pay patients." The complaint alleged AVHD and Abraham used a pattern of fraudulent schemes, including misappropriation of public funds, violations of federal and state antikickback statutes, and violations of state law prohibiting the making of false entries in the records of a corporation, as a part of establishing relationships with organized medical groups.

The proposed LCH complaint also alleged the above acts and practices have injured competition and that LCH has been placed at a substantial competitive disadvantage. The prayer requested (1) defendants be adjudged to have violated the relevant statutes and to have committed the alleged torts; (2) treble damages be assessed for violations of the Sherman Act, the Cartwright Act, and RICO; (3) AVHD be enjoined from owning or operating any health care facilities or financing organization except Antelope for a period of 10 years; (4) the Medical Group be required to repay to AVHD all public monies and the value of all goods and services unlawfully granted or transferred by AVHD and Antelope; (5) the Medical Group be required to be dissolved; and (6) "AVHD terminate the employment of [Abraham] and all other AVHD employees who participated in the unlawful conduct . . . ."

---

[3] In the original federal complaint, these statements were alleged to have been made by "an Antelope Valley hospital official." Abraham was not specifically named.

B. *Exchange of Letters by Counsel Pertaining to the Proposed First Amended Complaint in Federal Court*

Attached to Abraham's complaint in this state court action is a letter dated February 22, 1988, from Abraham's counsel, Richard P. Sybert of Sheppard, Mullin, Richter & Hampton, to trial counsel for LCH in the federal lawsuit, Mr. Robert Fabrikant of McKenna, Conner & Cuneo. Mr. Sybert wrote "to state in the strongest possible terms that I see no grounds for naming [Abraham] as a defendant, and that I believe to do so would constitute a clear abuse of the legal process." Mr. Sybert found no evidence his client was "acting other than in his capacity as an employee and agent of Antelope Valley Hospital."

In addition, in disparaging LCH's complaint, Mr. Sybert asserted LCH's principal problem was that it "may be facing effective competition." Sybert also asserted that LCH is "improperly using litigation to further anti-competitive business ends." Sybert wrote LCH that "we are investigating the possibility of bringing claims for, *inter alia,* abuse of process and malicious prosecution. Although I do not mean to exclude this possibility even if the complaint is not amended, this investigation obviously will intensify if, in fact, amended claims are brought against Mr. Abraham personally."

The concluding paragraph urged LCH to reconsider, whether or not the federal court granted leave to file the proposed first amended complaint, to dismiss Abraham voluntarily as a defendant.

Attached to Abraham's complaint as exhibit D in this state court action is a letter dated February 22, 1988, from Mr. Fabrikant to Mr. Sybert. There is no indication Mr. Fabrikant had received Mr. Sybert's letter of the same date or that Mr. Fabrikant was responding to it.

Mr. Fabrikant thanked Mr. Sybert for a letter of January 26 and agreed the litigation is primarily a fight between corporate entities. Nevertheless, regarding Abraham, Mr. Fabrikant stated: "His deposition testimony reveals significant and ongoing involvement in the conduct underlying the First Amended Complaint. If Mr. Abraham is prepared to terminate his employment within the Antelope Valley, we would seriously consider dropping him from this litigation."

C. *Order Permitting Amendment to Complaint in Federal Court*

In an order filed March 4, 1988, the federal district court granted LCH's motion for leave to add several new parties as defendants (including Abraham) and adding additional causes of action. The order states in part:

"Plaintiff may amend its complaint to add the new defendants . . . . Plaintiff has fifteen days from the date of this order to file its amended pleading."

The revised amended complaint, attached to Abraham's complaint in this state court action as exhibit E, contains virtually the same allegations as LCH's proposed first amended complaint. However, Abraham is not named as a defendant; and the prayer no longer asks for AVHD to terminate his employment. Nevertheless, *Abraham was named as a coconspirator* in the body of the complaint and virtually all the allegations regarding his conduct remained.

After the revised amended complaint was filed, Abraham asked to intervene in the federal lawsuit for purposes of asserting the causes of action alleged in the complaint now before this court. The district court denied Abraham's motion to intervene.

D. *Abraham's Superior Court Complaint*

On May 20, 1988, Abraham filed the instant lawsuit, attempting to allege causes of action for defamation, abuse of process, intentional interference with contractual relations, intentional interference with prospective economic advantage, conspiracy to intentionally interfere with contractual relations and prospective economic advantage, and intentional infliction of emotional distress. He named as defendants LCH; Paracelsus Healthcare Corporation, alleged to be LCH's parent corporation; and Sierra. All of the allegations in Abraham's complaint originate with LCH's involvement in the federal lawsuit described above.

Abraham alleges that LCH did not name him as a defendant in its original federal complaint, but did name him as a defendant in its proposed first amended complaint, in which he was accused of "a wide variety of unlawful and criminal acts . . . including kickbacks, misappropriation of public funds, and corruption." The relief sought by LCH included termination of Abraham's employment.

Abraham's complaint next alleges that before the federal court ruled on the motion of LCH for leave to file its proposed amended federal complaint, LCH allegedly "caused its allegations to be published in the local press." A copy of the articles, which appeared on Christmas Day in the Antelope Valley Press, were attached to Abraham's complaint. The articles in the Antelope Valley Press reported the pending motion for leave to file the amended complaint and the allegations made in the proposed amended complaint. Abraham further alleges on information and belief that defendants or their agents also "caused such allegations and charges against

Abraham to be disseminated by word of mouth in the Antelope Valley and specifically within the medical community there."

The Abraham complaint also contains allegations that, based on the individual allegations against Abraham in the press and in the proposed amended complaint, Antelope secured independent counsel for him. Independent counsel allegedly reviewed the case and decided Abraham was at all times acting within the scope of his employment at the express direction of his employer, evidence allegedly known by and available to LCH before LCH made "its new allegations against Abraham in its proposed Amended Federal Complaint and caused those allegations to be published in the *Antelope Valley Press.*"

Abraham's independent counsel then contacted LCH's counsel, explaining the factual deficiencies of the complaint. Abraham's complaint contains allegations that counsel for LCH offered to drop Abraham from the lawsuit if Abraham was prepared to terminate his employment within the Antelope Valley.

The complaint then states that, thereafter, on March 2, 1988, a pending motion by Antelope for summary judgment in the federal action was granted. On March 4, the federal court granted LCH's motion for leave to file its amended federal complaint. On March 18, LCH filed an amended complaint that dropped Abraham as a named defendant, but retained the charging allegations from the proposed amended federal complaint.

According to Abraham's complaint, LCH launched a personal attack on him "for the purpose of prompting the termination of his employment at [Antelope]. LCH seeks to have [him] fired because he has done his job too well and made [Antelope] a more effective competitor with LCH."

The six causes of action are summarized as follows:

First Cause of Action for Defamation.

Abraham alleges LCH's proposed amended federal complaint, the December 25 article in the Antelope Valley Press "concerning [LCH's] proposed Amended Federal Complaint," and the revised federal complaint accuse him of a wide variety of unlawful and criminal acts and are false and libelous on their face. Because these statements allegedly "had no reasonable or logical relation to the federal action and were not made to achieve the objects of the litigation or to promote the interests of justice," they purportedly were not privileged.

On information and belief, Abraham further alleges "defendants or their agents have also caused such allegations and charges against Abraham to be disseminated by word of mouth in the Antelope Valley and specifically within the medical community there." As damages, Abraham alleges loss of and damage to his reputation and his occupation as well as the suffering of shame, mortification, and hurt feelings, in an amount no less than $100,000. Because the acts were allegedly committed with oppression, fraud, and malice, Abraham seeks punitive damages.

Second Cause of Action for Abuse of Process.[4]

Abraham alleges LCH willfully misused the process of the federal court by filing its motion for leave to amend and, after leave to file was granted, not filing the proposed amended complaint, but instead filing its revised federal complaint. LCH's alleged "ulterior purpose and motivation in so willfully misusing the process of the Federal Court. . . was to force [Antelope] to terminate Abraham's employment . . . , to force Abraham to terminate his employment in the Antelope Valley, and to otherwise gain some collateral advantage over Abraham and his employer, [Antelope]."

Third Cause of Action for Intentional
Interference With Contractual Relation.

Abraham alleges there was a contract between him and his employer; defendants knew of the employment contract; and both separately and in conspiracy intentionally interfered with the employment relationship, all with the intent to harm Abraham financially and to induce Antelope to breach its employment contract with him.

Fourth Cause of Action for Intentional
Interference With Prospective Business Advantage.

Abraham alleges defendants knew of the economic relationship between him and Antelope and intentionally interfered with it, all "with the intent to harm Abraham financially and to induce [Antelope] to sever its economic relationship" with him.

Fifth Cause of Action for Conspiracy to
Intentionally Interfere With Contractual
Relations and Prospective Economic Advantage.

Abraham alleges that defendants conspired to interfere with Abraham's contractual relations and prospective economic advantage.

[4] Each cause of action realleged by reference and incorporated the previous allegations.

Sixth Cause of Action for Intentional Infliction of Emotional Distress.

Abraham alleges all of the above acts were "outrageous and directed solely at attempting to terminate Abraham's employment with [Antelope] and in the Antelope Valley." The conduct allegedly was intentional and malicious, done with the knowledge that Abraham's emotional and physical distress would thereby increase, and with a wanton and reckless disregard of the consequences to him. LCH's conduct allegedly subjected Abraham to humiliation, mortification, and severe emotional distress; as a result, he has allegedly suffered humiliation, mental anguish, and emotional and physical distress.

## E. *Respondents' Demurrer to Abraham's Complaint in the Superior Court*

Respondents LCH and Paracelsus Healthcare Corporation demurred to the complaint on grounds the alleged causes of action were barred by the absolute privilege of Civil Code section 47, subdivision 2 and the cause of action for abuse of process failed to set forth facts sufficient to constitute a cause of action. Sierra separately demurred.[5]

Abraham argued that the privilege does not apply because it protects publications made in connection with judicial proceedings only when the litigation is contemplated in good faith and the publications are made to achieve the objects of the litigation, are in furtherance of the litigation, and promote the interests of justice. In addition, Abraham asserted he sufficiently pled his cause of action for abuse of process.

The demurrers were heard by the Honorable Margaret M. Grignon, Judge presiding on September 30, 1988. The court sustained the demurrers without leave to amend "on the grounds that the conduct complained of in the Complaint is protected by the privilege of *Civil Code* section 47(2)" and dismissed the complaint against all defendants. ▪ ▪▪▪ Appellant appeals from the order of dismissal.[6]

---

[5] Sierra maintains that the publications at issue in the superior court action were not made by Sierra, and therefore its position in the lawsuit is significantly different from that of the other respondents. Since we hold all publications at issue to be absolutely privileged under Civil Code section 47, subdivision 2, we find it unnecessary to reach the additional issue adduced by Sierra of its purported lack of involvement in the publications.

[6] The order of dismissal is a final judgment from which an appeal can be taken. (*Carney* v. *Rotkin, Schmerin & McIntyre* (1988) 206 Cal.App.3d 1513, 1518, fn. 1 [254 Cal.Rptr. 478].)

## III.

## DISCUSSION

A. *The Absolute Privilege of Civil Code Section[7] 47, Subdivision 2 Bars All of Abraham's Cause of Action, Except for Malicious Prosecution.*

### 1. *The Standard of Review.*

█ The Court of Appeal in *Carden* v. *Getzoff* (1987) 190 Cal.App.3d 907, 912 [235 Cal.Rptr. 698], set forth the standard of review for the appellate court's review of a dismissal following the sustaining of a demurrer: " ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citations.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]' [Citation.]"

█ As we now explain, the plain meaning of the section 47, subdivision 2 privilege, its legislative history, and case law all support the trial court's determination that Abraham's complaint is based on absolutely privileged publications made in a judicial proceeding. Abraham's contention, that the "restrictive test" enunciated in *Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818 [106 Cal.Rptr. 718], should be adopted, is not supported by either the statute or controlling case law. The trial court properly rejected appellant's interpretation of section 47, subdivision 2, and its dismissal should be affirmed.

### 2. *The Plain Meaning of Section 47, Subdivision 2 Demonstrates It Is an Absolute Privilege, Unaffected by Malice.*

Section 47, subdivision 2 provides: *"A privileged publication or broadcast is one made—. . . 2. In any* (1) legislative or (2) *judicial proceeding,* or (3) in any other official proceeding authorized by law, or (4) in the initiation or

---

[7]Unless otherwise noted, all statutory references are to the Civil Code.

course of any other proceeding authorized by law and reviewable [by writ of mandate]; provided, that an allegation or averment contained in any pleading or affidavit filed in an action for divorce or an action prosecuted under [former] Section 137 of this code made of or concerning a person by or against whom no affirmative relief is prayed in such action shall not be a privileged publication or broadcast as to the person making said allegation or averment within the meaning of this section unless such pleading be verified or affidavit sworn to, and be made without malice, by one having reasonable and probable cause for believing the truth of such allegation or averment and unless such allegation or averment be material and relevant to the issues in such action."[8] (Italics added.)

■ "When statutory language is clear and unambiguous there is no need for construction, and courts should not indulge in it." (*West Covina Hospital* v. *Superior Court* (1986) 41 Cal.3d 846, 850 [226 Cal.Rptr. 132, 718 P.2d 119, 60 A.L.R.4th 1257].) ■ Even the most casual reading demonstrates that, except in a specific dissolution context discussed below and not present in the case at bar, section 47, subdivision 2 is an absolute privilege unaffected by malice. ■■■ While subdivision 1 requires the publication to be in the "proper" discharge of an official duty[9] and subdivision 3 provides that the communication to an interested person must be "without malice" for the privilege to attach, there is no such limitation in subdivision 2.

Furthermore, as we now explain, the legislative history of section 47 and controlling case law support the plain meaning of the statute.

3. *The History of Section 47, Subdivision 2 Demonstrates the Legislature Intended It to Be an Absolute Privilege, Not Affected by Malice or the Intent to Do Harm.*

■ The primary task in construing a statute "is to determine the Legislature's intent. [Citation.] 'The court turns first to the words themselves for

---

[8] Subdivision 1 of section 47 provides an absolute privilege for publications and broadcasts made "[i]n the proper discharge of an official duty." Subdivision 3 provides a qualified privilege for certain communications, made without malice, to a person interested therein by one who is also interested. Subdivision 4 provides a privilege to a publication or broadcast "[b]y a *fair and true report in a public journal, of (1) a judicial, (2) legislative, or (3) other public official proceeding, or (4) of anything said in the course thereof* . . . ." (Italics added.) Subdivision 5 allows a privilege for a publication "[b]y a fair and true report of (1) the proceedings of a public meeting, if such meeting was lawfully convened for a lawful purpose and open to the public, or (2) the publication of the matter complained of was for the public benefit."

[9] Despite the adjective "proper," subdivision 1 provides an absolute privilege for high executive officials. (*Saroyan* v. *Burkett* (1962) 57 Cal.2d 706, 710 [21 Cal.Rptr. 557, 371 P.2d 293].)

the answer.' [Citations.]" (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724 [257 Cal.Rptr. 708, 771 P.2d 406].)

"[I]t is instructive to compare section 47, subdivision 2, as originally enacted in 1872 with its present form." (*O'Neil* v. *Cunningham* (1981) 118 Cal.App.3d 466, 474 [173 Cal.Rptr. 422]; see also *McClatchy Newspapers, Inc.* v. *Superior Court* (1987) 189 Cal.App.3d 961, 969-973 [234 Cal.Rptr. 702]); *Thornton* v. *Rhoden* (1966) 245 Cal.App.2d 80, 87-90 [53 Cal.Rptr. 706, 23 A.L.R.3d 1152]; and *Gosewisch* v. *Doran* (1911) 161 Cal. 511, 514 [119 P. 656].)

When enacted in 1872, section 47, subdivision 2 "extended the privilege only as follows: 'In testifying as a witness in any proceeding authorized by law to a matter pertinent and material, or in reply to a question allowed by the tribunal.' . . . The subdivision was amended in 1873-74. It now applied 'In any legislative or judicial proceeding, or in any other official proceeding authorized by law.' The privilege was thus broadened by being made applicable to persons other than witnesses and all references to materiality and pertinency were removed from this section. Thus it stood until 1927." (Fn. omitted.) (*Thornton* v. *Rhoden, supra,* 245 Cal.App.2d at p. 87.) "The contrast between the 1872 version and the 1873-1874 version of [§ 47, subd. 2] is so striking as to suggest that the Legislature intended to insulate from any liability in defamation anybody who, in a judicial proceeding, said or wrote anything about anybody." (*O'Neil* v. *Cunningham, supra,* 118 Cal.App.3d at p. 474.)

In 1911, the California Supreme Court in *Gosewisch* held that malice did not defeat the privilege. (*Thornton* v. *Rhoden, supra,* 245 Cal.App.2d at p. 88.)

Then, in 1927, "a proviso was added which 'changed the absolute privilege to a conditional privilege in a single subclass of judicial proceedings— divorce proceedings' . . . ." (*McClatchy Newspapers, Inc.* v. *Superior Court, supra,* 189 Cal.App.3d at p. 970.) The 1927 amendment to section 47, subdivision 2 provided that allegations in a pleading or affidavit *in a dissolution action* made by or concerning a person by or against whom no affirmative relief is prayed "shall not be a privileged publication as to the person making said allegation . . . unless such pleading . . . be made *without malice,* by one having *reasonable and probable cause for believing the truth of such allegation* . . . and *unless such allegation* . . . *be material and relevant to the issues in such action.*" (Italics added.)

■ " 'It is a well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has

excluded it in another, it should not be implied where excluded.' " (*Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d at p. 725.) Thus, the only reasonable inference to be drawn from the Legislature's use of special criteria in the dissolution context is that, in the nondissolution context, none of these criteria influence application of the privilege. (*Lewis* v. *Linn* (1962) 209 Cal.App.2d 394, 398-399 [26 Cal.Rptr. 6]; see also *King* v. *Borges* (1972) 28 Cal.App.3d 27, 32-33 [104 Cal.Rptr. 414] [distinguishing the part of § 47, subd. 2 dealing with dissolution pleadings and finding the absolute privilege applies if the matter has " 'some relation' " to the judicial proceeding]; *McClatchy Newspapers, Inc.* v. *Superior Court, supra,* 189 Cal.App.3d at p. 970; *Moore* v. *United States F. & G. Co.* (1932) 122 Cal.App. 205, 210-211 [9 P.2d 562].) Thus, the legislative history, like a plain reading of the statute, confirms the absolute nature of the privilege in the nondissolution context.

4. *The California Supreme Court Has Decided the Privilege Under Section 47, Subdivision 2 Is Absolute and Not Affected by a Defendant's Motives. The Only Limitation Is a Reasonable Connection to the Judicial Proceeding.*

■ Over 70 years ago, in *Gosewisch* v. *Doran, supra,* 161 Cal. 511, the Supreme Court decided the "only limitation," if any, on the privilege "is that the defamatory matter must be pertinent and material to the cause or subject of inquiry before the court. *If it be pertinent, the defendant's malice or bad faith does not affect the privileged character of the publication.*" (Italics added.) (*Id.,* at p. 514.) "Subject to the possible limitation of relevancy and materiality, the privilege attaching to statements made in the course of judicial proceedings is absolute." (*Id.,* at p. 515.)

In 1956, the court in *Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 379 [295 P.2d 405] applied the section 47, subdivision 2 privilege to a nondefamation action and found section 47, subdivision 2 "states the long-established rule that publications made in the course of a judicial proceeding are absolutely privileged . . . ." As Prosser notes, "Absolute immunity has been confined to a very few situations where there is an obvious policy in favor of permitting complete freedom of expression, *without any inquiry as to the defendant's motives.*" (Italics added.) (Prosser & Keeton, Torts (5th ed. 1984) § 114, p. 816.)

The *Albertson* court applied a liberal standard for determining whether a statement is sufficiently connected to the judicial proceedings: "It is our opinion that the privilege applies to any publication, . . . that is required . . . or permitted . . . by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made

outside the courtroom and no function of the court or its officers is invoked. . . . Thus, it is not limited to the pleadings, the oral or written evidence, to publications in open court or in briefs or affidavits. *If the publication has a reasonable relation to the action and is permitted by law, the absolute privilege attaches.*" (Italics added.) (*Albertson v. Raboff, supra,* 46 Cal.2d 27 at pp. 380-381.)[10]

In 1982, the court in *Slaughter v. Friedman* (1982) 32 Cal.3d 149, 155 [185 Cal.Rptr. 244, 649 P.2d 886] reiterated the absolute nature of the section 47, subdivision 2 privilege. Even more recently, in *Ribas v. Clark* (1985) 38 Cal.3d 355 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417], the Supreme Court discussed the general background and public policy behind section 47, subdivision 2 *and rejected the contention that a tortious nature and purpose takes a cause of action outside the privilege. (Id.,* at p. 364.)

Broad application of the absolute privilege in a judicial proceeding is explained by the critical role of the privilege in promoting free access to the courts and in shielding "counsel, his [or her] client and witnesses from having their motives questioned and being subjected to litigation if some connection between the utterance and the judicial inquiry can be established." (*Thornton v. Rhoden, supra,* 245 Cal.App.2d at p. 90.) ■ As the California Supreme Court has stated, "the obvious purpose of section 47 [is] to afford litigants the utmost freedom of access to the courts to secure and defend their rights without fear of being harassed by actions for defamation." (*Albertson v. Raboff, supra,* 46 Cal.2d at p. 380; accord *Ribas v. Clark, supra,* 38 Cal.3d 355, 364-365 ["Underlying the privilege is the vital public policy of affording free access to the courts and facilitating the crucial functions of the finder of fact."]; *Berman v. RCA Auto Corp.* (1986) 177 Cal.App.3d 321, 324-325 [222 Cal.Rptr. 877]; *Loomis v. Superior Court* (1987) 195 Cal.App.3d 1026, 1030 [241 Cal.Rptr. 236] ["The privilege would have little value if attorneys could not make colorable, but unsuccessful, arguments without fear of engendering litigation over publication of materials to support their arguments."].)[11]

[10]" 'California courts have consistently applied a liberal standard for establishing a relationship between publications made by parties and judicial proceedings.' " (*Financial Corp. of America v. Wilburn* (1987) 189 Cal.App.3d 764, 772 [234 Cal.Rptr. 653].)

[11] Section 47, subdivision 2 also applies to official proceedings authorized by law; similar policy reasons support an absolute privilege in that context. (See *Imig v. Ferrar* (1977) 70 Cal.App.3d 48, 56 [138 Cal.Rptr. 540] [" 'The importance of providing to citizens free and open access to governmental agencies for the reporting of suspected illegal activity outweighs the occasional harm that might befall a defamed individual.' "]; *O'Shea v. General Telephone Co.* (1987) 193 Cal.App.3d 1040, 1047-1049 [238 Cal.Rptr. 715] [responses to inquiries in a background investigation of a potential CHP recruit held absolutely privileged under section 47, subdivision 2 as part of an official proceeding authorized by law].)

Another policy relied on by the courts in upholding the absolute nature of the privilege is the desire to prevent the commencement of one lawsuit from spawning yet another. Given the value of finality in litigation and its concomitant effect on the judicial system, courts have upheld the section 47, subdivision 2 privilege on grounds that all disagreements should be resolved in the same proceeding or there would be endless litigation "in which nothing was ever finally determined." (*Kachig* v. *Boothe* (1971) 22 Cal.App.3d 626, 642 [99 Cal.Rptr. 393].)

As with all privileges, some who are undeserving may benefit from section 47, subdivision 2; but that is the price the Legislature has agreed to pay in order to protect the right of attorneys, witnesses, jurors, and judges to speak freely in the course of judicial proceedings, without fear of subsequent lawsuits. " 'The resulting lack of any really effective civil remedy against perjurers is simply part of the price that is paid for witnesses who are free from intimidation by the possibility of civil liability for what they say.' " (*Ribas* v. *Clark*, *supra*, 38 Cal.3d at p. 365.)[12]

In *Kachig* (cited with approval in *Ribas*), the court "with considerable regret and dissatisfaction" nevertheless refused to give relief to a party against whom previous final judgments had been entered allegedly based on a false document and perjured testimony. (*Kachig* v. *Boothe, supra*, 22 Cal.App.3d at p. 642.) As Justice Kaufman, writing for the court, stated: "[W]e recognize that the wrong in this case is a most grievous one, and we should be glad to redress it if a rule could be devised that would remedy the evil without producing mischiefs far worse. Reluctance on the part of witnesses to testify for fear of subsequent harassment by unfounded claims of perjury or endless litigation in which nothing was ever finally determined would be worse than occasional miscarriages of justice." (*Ibid.*)

It is tempting to assist those who may be wronged by invocation of the privilege. However, "it would be difficult if not impossible to formulate a

---

[12]See *Friedman* v. *Knecht* (1967) 248 Cal.App.2d 455, 462-463 [56 Cal.Rptr. 540] [" 'The rule of law exists, not because the conduct of those persons ought not of itself to be actionable, but because if their conduct was actionable, actions would be brought against judges and witnesses in cases in which they had not spoken with malice, in which they had not spoken with falsehood. It is not a desire to prevent actions from being brought in cases where they ought to be maintained that has a led to the adoption of the present rule of law; but it is the fear that if the rule were otherwise, numerous actions would be brought against persons who were merely discharging their duty. It must always be borne in mind that it is not intended to protect malicious and untruthful persons, but that it is intended to protect persons acting bona fide, who under a different rule would be liable, not perhaps to verdicts and judgments against them, but to the vexation of defending actions.' "]; *Pettitt* v. *Levy* (1972) 28 Cal.App.3d 484, 492 [104 Cal.Rptr. 650] ["It is not gratifying to reach a result which insulates those guilty of alleged heinous conduct from answering therefor. However, we are satisfied that the purpose and philosophy of the privilege compels this result and that any narrowing of the privilege to redress this grievance would produce mischiefs far worse."].

rule that would assure that only 'deserving' cases give rise to tort relief." (Cf. *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 697 [254 Cal.Rptr. 211, 765 P.2d 373].)[13]

■ Along with the plain meaning of the statute and its legislative history, decisions of the Supreme Court thus make clear that, except for an action for malicious prosecution (*Albertson* v. *Raboff, supra*, 46 Cal.2d at p. 382), the privilege under section 47, subdivision 2 is absolute and unaffected by malice; the publication need only have a reasonable relation to the judicial proceeding in which it is made. Abraham disregards these authorities; he is not free to do so. (See *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d. 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]; see *Steiner* v. *Eikerling* (1986) 181 Cal.App.3d 639, 642, fn. 3 [226 Cal.Rptr. 694] ["Given the language of *Ribas*, its specific mention of *Pettitt* [v. *Levy* (1972) 28 Cal.App.3d 484] and its endorsement of the rationale that heinous conduct must be condoned lest greater mischiefs occur[,] we are bound under the doctrine of stare decisis to follow *Ribas*."].)

### 5. *Most Court of Appeal Decisions Also Recognize the Absolute Nature of the Privilege Under Section 47, Subdivision 2.*

In addition to dispositive Supreme Court authority, there is a long line of decisions by the Courts of Appeal, both recent and longstanding, supporting an expansive interpretation of the section 47, subdivision 2 privilege.[14] Several are from this division. (*Nagy* v. *Nagy* (1989) 210 Cal.App.3d 1262, 1270-1271 [258 Cal.Rptr. 787] [Statements are privileged regardless of publisher's motives.]; *Profile Structures, Inc.* v. *Long Beach Bldg. Material Co.* (1986) 181 Cal.App.3d 437, 442 [226 Cal.Rptr. 192] [" 'The publication need not be pertinent, relevant or material in a technical sense to any issue if

---

[13] The circumstances of *Kim* v. *Walker* (1989) 208 Cal.App.3d 375 [295 P.2d 405], a recent "particularly egregious example of an abuse of the legal system," make apparent the justification and need for the privilege. (*Id.*, at p. 386, fn. 10.) A parolee filed complaints in more than 20 lawsuits against everyone, including attorneys and judges, with any connection to allegations he had molested his daughter. (*Id.*, at pp. 379-380, fn. 4.) The Court of Appeal affirmed dismissal following sustaining of demurrers and relied on the privilege of Civil Code section 47, subdivisions 1 to 4. (*Id.*, at p. 383; see also *117 Sales Corp.* v. *Olsen* (1978) 80 Cal.App.3d 645, 651 [145 Cal.Rptr. 778] [small claims consumer who sued retailer was then sued by retailer based on allegations in small claims suit; retailer's lawsuit properly dismissed based on absolute privilege of § 47, subd. 2].)

[14] Some of these cases directly reject the theory advanced by Abraham and *Bradley* v. *Hartford Acc. & Indem. Co., supra*, 30 Cal.App.3d 818, that a publisher's motives or good faith remove a publication from the privilege; others reinforce decisions of the Supreme Court in *Gosewisch, Albertson,* and *Ribas* that limitations, if any, to the section 47, subdivision 2 privilege consist only of general relevance and connection to the judicial proceeding. None of these cases, even when citing *Bradley,* fails to apply the privilege under section 47, subdivision 2.

it has some connection or relation to the proceedings.' [Citations.] Any doubt as to whether such relationship or connection existed must be resolved in favor of a finding of privilege."]; and *Drasin v. Jacoby & Meyers* (1984) 150 Cal.App.3d 481, 485 [197 Cal.Rptr. 768].)

Other cases from the Second Appellate District upholding the privilege include:

a) Division One: *Woodcourt II Limited* v. *McDonald Co.* (1981) 119 Cal.App.3d 245, 251 [173 Cal.Rptr. 836] (per Lillie, J.) [The Supreme Court in *Albertson* imposed no limitations or qualifications on the absolute privilege it accorded notice of lis pendens under section 47, subdivision 2; in any event, there was a patently obvious legitimate relationship between the lis pendens and the main lawsuit.];[15] (*Brody* v. *Montalbano* (1978) 87 Cal.App.3d 725, 733 [151 Cal.Rptr. 206].)

b) Division Two: *Chen* v. *Fleming* (1983) 147 Cal.App.3d 36, 39-41 [194 Cal.Rptr. 913]; *Rosenthal* v. *Irell & Manella* (1982) 135 Cal.App.3d 121, 125-126 [185 Cal.Rptr. 92]; *Portman* v. *George McDonald Law Corp.* (1979) 99 Cal.App.3d 988, 990-991 [160 Cal.Rptr. 505] [adopting *Albertson* rationale that publication " 'need only have some connection or relation to the proceedings' " for the privilege to attach].

c) Division Three: *Carden* v. *Getzoff, supra,* 190 Cal.App.3d 907 [upholds sustaining of demurrer although complaint alleged expert accounting witness for plaintiff's former wife had manufactured false evidence and testified falsely]; *Lerette* v. *Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573 [131 Cal.Rptr. 592]; *Thornton* v. *Rhoden, supra,* 245 Cal.App.2d at page 93 ["If the matter is privileged, it is so *regardless of the good faith vel non of the defamer.* " (Italics added.)].

d) Division Four: *Jordan* v. *Lemaire* (1963) 222 Cal.App.2d 622, 625 [35 Cal.Rptr. 337] [To be protected by section 47, subdivision 2, the defamatory matter need not even be relevant or pertinent but must only " 'have some reference to the judicial function which the judge is performing' " and must

---

[15]Contrast *Kinnamon* v. *Staitman & Snyder* (1977) 66 Cal.App.3d 893 [136 Cal.Rptr. 321], where in a two-to-one decision, Division One held there was no section 47, subdivision 2 privilege in an action for emotional distress based on an attorney's letter threatening criminal action for bouncing a check. The court found the threat in violation of the Rules of Professional Conduct "cannot serve the purpose of litigation. It is a cause for discipline of the attorney [citations], a proposition totally inconsistent with a privileged status." (*Id.,* at p. 897.) The *Kinnamon* rationale was criticized in *O'Neill* v. *Cunningham, supra,* 118 Cal.App.3d at page 476.

not be " 'so palpably irrelevant to the subject matter of the controversy that no reasonable man can doubt its irrelevancy and impropriety.' "].

e) Division Five: *Berman* v. *RCA Auto Corp., supra,* 177 Cal.App.3d at pages 324-325; *Izzi* v. *Rellas* (1980) 104 Cal.App.3d 254, 262-263 [163 Cal.Rptr. 689]; *Imig* v. *Ferrar, supra,* 70 Cal.App.3d at pages 55-56; *Scott* v. *McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277, 285 [112 Cal.Rptr. 609] [Absolute privilege of section 47, subdivision 2 applies to legislative proceedings, and existence of malice will not defeat the privilege "when it is shown that the statement which is alleged to be defamatory bears some connection to the work of the legislative body."]; *Friedman* v. *Knecht, supra,* 248 Cal.App.2d at page 462 [The court is not concerned with a publisher's motives.].

Cases from other districts demonstrating an interpretation of section 47, subdivision 2 in conformity with the philosophy expounded in *Albertson* and *Ribas* include:

a) First Appellate District: *Loomis* v. *Superior Court, supra,* 195 Cal.App.3d 1026, 1029 [Malice or intent to do harm does not defeat section 47, subdivision 2.]; *Steiner* v. *Eikerling, supra,* 181 Cal.App.3d at page 642 [impliedly rejecting *Bradley* rationale]; *Costa* v. *Superior Court* (1984) 157 Cal.App.3d 673, 678-679 [204 Cal.Rptr. 1]; *O'Neill* v. *Cunningham, supra,* 118 Cal.App.3d at pages 475-476 [rejecting *Bradley*'s "interest of justice" test, and holding letter written by attorney in an attempt to settle a malpractice action absolutely privileged under section 47, subdivision 2 although the letter allegedly defamed client]; *Tiedemann* v. *Superior Court* (1978) 83 Cal.App.3d 918, 926 [148 Cal.Rptr. 242] [libel and slander based on former business associate's communication to IRS re plaintiff's possible tax fraud privileged, *even if defendant was maliciously motivated by revenge*]; *Smith* v. *Hatch* (1969) 271 Cal.App.2d 39, 45-50 [76 Cal.Rptr. 350] [letter sent by attorney to client and read to association at meeting was absolutely privileged under section 47, subdivision 2 and qualifiedly privileged under section 47, subdivision 3; broad test adopted for application of the privilege]; *Bernstein* v. *Alameda etc. Med. Assn.* (1956) 139 Cal.App.2d 241, 246 [293 P.2d 862]; *Lewis* v. *Linn, supra,* 209 Cal.App.2d 394.

b) Third Appellate District: *Williams* v. *Coombs* (1986) 179 Cal.App.3d 626, 645 [224 Cal.Rptr. 865] disapproved on another point in *Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863, 883, footnote 9 [254 Cal.Rptr. 336, 765 P.2d 498] [In an action for intentional infliction of emotional

distress, "[n]either actual malice or falsehood will defeat the privilege so long as the statement has any reasonable connection with a legal action and is made in furtherance of the litigation," but plaintiff is allowed to proceed with a malicious prosecution action.]; *Block* v. *Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386, 392-393 [182 Cal.Rptr. 438]; *Twyford* v. *Twyford* (1976) 63 Cal.App.3d 916, 924-926 [134 Cal.Rptr. 145] [affirms dismissal of husband's action against former wife and her attorneys for malicious prosecution, abuse of process, and defamation where, in contempt proceedings, wife allegedly filed a request for admission in which she falsely accused husband of forging her name on tax check].

c) Fourth Appellate District: *Larmour* v. *Campanale* (1979) 96 Cal.App.3d 566, 568-569 [158 Cal Rptr. 143]; *Umansky* v. *Urquhart* (1978) 84 Cal.App.3d 368, 371-373 [148 Cal.Rptr. 547] [If complaint allegations are consistent with the objects of the litigation, inquiring into the motive of counsel would have an unnecessary chilling effect upon lawyers.]; *Kachig* v. *Boothe, supra*, 22 Cal.App.3d at pages 640-641 [no cause of action for intentional infliction of emotional distress where plaintiff lost at a previous trial based on a manufactured letter and perjured testimony]; *Whelan* v. *Wolford* (1958) 164 Cal.App.2d 689, 694 [331 P.2d 86] [Absolute privilege applies to any publication required or permitted by law in the course of an official proceeding as long as there is a reasonable relation to the action.].

d) Fifth Appellate District: *McClatchy Newspapers, Inc.* v. *Superior Court, supra*, 189 Cal.App.3d 961, 971-977 [rejecting *Bradley*'s "promote the interest of justice" test, and holding that even though allegations, testimony and evidence were produced pursuant to a conspiracy to invoke immunity under section 47, subdivisions 2 and 4, a report of testimony with a reasonable relation to the action in which the statements were introduced is absolutely privileged]; *Pettitt* v. *Levy, supra*, 28 Cal.App.3d at pages 488-490 [demurrer sustained to complaint alleging defendants had prepared and submitted a false or forged document to city council and planning commission, finding malice or intent to do harm is not relevant to an absolute privilege like section 47, subdivision 2].

e) Sixth Appellate District: *Financial Corp. of America* v. *Wilburn, supra*, 189 Cal.App.3d at page 777 ["Plaintiffs' premise is that the subjective intent, purpose, or knowledge of a writer can destroy the privileged status of otherwise privileged statements. The law is otherwise."].

As we now explain, the few cases that require consideration of motive or purpose in determining whether to apply the privilege under section 47,

subdivision 2 are in conflict with controlling Supreme Court authority, the weight of authority among the Courts of Appeal and both the plain meaning and history of section 47, subdivision 2.

 *6. Bradley v. Hartford Acc. & Indem. Co. and Its Progeny Ignore the Plain Meaning and History of Section 47, Subdivision 2 and Impose a Requirement That Defeats the Legislature's Intent. We Therefore Decline to Follow Bradley and the Decisions of the Court of Appeal Which Rely on It.*

 The principal case upon which Abraham relies is *Bradley* v. *Hartford Acc. & Indem. Co., supra,* 30 Cal.App.3d 818. The facts in *Bradley,* however, are distinguishable from the instant case. The parties who made the allegedly defamatory statements in *Bradley* were not parties or attorneys in the prior action, and the statements were "uttered orally outside of court and not in the course of any legal proceedings to third persons who had no interest" in the action. (*Id.,* at p. 822; compare *Carden* v. *Getzoff, supra,* 190 Cal.App.3d at pp. 913-914.) Furthermore, *"extrajudicial documents, not appropriately a part of the judicial proceedings"* were allegedly filed for the sole purpose of having them republished by the news media. (Italics added.) (*Bradley, supra,* 30 Cal.App.3d at p. 822.)

 Unlike the case at bar, where all parties were interested in and involved in the federal litigation and the statements were directly related to the federal claims, the reasonable relation to a judicial proceeding does appear attenuated in *Bradley.* But the *Bradley* court did not stop with a holding that reasonable relationship to a judicial proceeding was nonexistent; rather, in dicta, the *Bradley* court laid *"special emphasis . . . on the requirement that* [the publication] *be made in furtherance of the litigation and to promote the interest of justice"* and concluded "[o]nly if this requirement has been satisfied, is it appropriate for the courts to define liberally the scope of the term 'judicial proceeding' and the persons who should be regarded as litigants or other participants." (Original italics.) (30 Cal.App.3d at p. 826.) The *Bradley* court (First Dist., Div. Two) later reaffirmed this dicta in *Barbary Coast Furniture Co* v. *Sjolie* (1985) 167 Cal.App.3d 319, 334-335 [213 Cal.Rptr. 168].[16]

---

[16] However, as the court in *Steiner* v. *Eikerling, supra,* 181 Cal.App.3d at page 642, footnote 3, points out, the decision in *Barbary Coast* was filed 37 days after and does not account for or cite the Supreme Court's decision in *Ribas* v. *Clark, supra,* 38 Cal.3d at page 364 [Tortious purpose does not take cause of action outside section 47, subdivision 2 privilege.].

 Moreover, earlier decisions by the *Bradley* court point in a different direction. (See, e.g., *Ascherman* v. *Natanson* (1972) 23 Cal.App.3d 861, 865-867 [absolute privilege for defamatory statements in quasi-judicial investigation preceding consideration of doctor's application for hospital staff privileges; jury verdict finding defamation must yield to the § 47, subd. 2

The *Bradley* requirement that the publication be made "in furtherance of the litigation" may conform to the plain meaning of the statute, its legislative history, and controlling case law so long as it is merely another way of stating the publication need have only a reasonable relation or connection to the proceeding in order to qualify for the privilege. Thus, for example, *Lerette* v. *Dean Witter Organization, Inc., supra*, 60 Cal.App.3d at page 576, footnote 5, interprets *Bradley* as imposing "requirements [that] basically demand that the offending communication be relevant to the judicial proceeding." (See also *McClatchy Newspapers, Inc.* v. *Superior Court, supra*, 189 Cal.App.3d at p. 973, fn. 3 [adopting similar construction, but specifically rejecting *Bradley*'s "promotion of the interest of justice" qualification to the absolute privilege]; *O'Neill* v. *Cunningham, supra*, 118 Cal.App.3d at pp. 474-475; *Carney* v. *Rotkin, Schmerin & McIntyre, supra*, 206 Cal.App.3d at pp. 1521-1522.) If this interpretation of *Bradley* is adopted, the requirement is met in the case at bar because the statements about Abraham were directly connected to the federal lawsuit and are at the core of that litigation.

However, even if one can harmonize part of *Bradley* with controlling Supreme Court authority, the additional *Bradley* requirement, that the publication must "promote the interest of justice," is at odds with the very nature of the privilege. The good faith of the publisher or concern with the interest of justice is simply not at issue. For example, defamation by definition does not "promote the interest of justice." Nevertheless, the Legislature has seen fit in enacting section 47, subdivision 2 to provide an absolute privilege to protect defamatory publications made in judicial proceedings. "It seems reasonably certain that the Legislature did not immunize a defamer from liability for his defamation because it thought that a defamatory publication in a judicial proceeding promoted 'the interest of justice.'" (*O'Neil* v. *Cunningham, supra*, 118 Cal.App.3d at p. 475.) Furthermore, if the motive of the publisher becomes an issue, the case cannot often be disposed of by demurrer or even summary judgment, and the publisher therefore will assuredly be subject to litigation built upon previous litigation, precisely what the privilege seeks to avoid. (*Kachig* v. *Boothe, supra*, 22 Cal.App.3d at p. 642.)

---

privilege.]; *Rader* v. *Thrasher* (1972) 22 Cal.App.3d 883, 887-889 [99 Cal.Rptr. 670] [Statement need not be relevant, pertinent or material if it has some connection or relation to the judicial proceeding, even if made with malice.]. Compare *Frisk* v. *Merrihew* (1974) 42 Cal.App.3d 319, 326 [116 Cal.Rptr. 781, 85 A.L.R.3d 1128] [Whether a privileged occasion is abused is for the jury's determination unless the facts permit but one conclusion.]; and *Silberg* v. *Anderson* ■ (Cal.App.), also decided by the *Bradley* court.)

### 7. *Other Cases Relied Upon by Abraham Can Be Distinguished.*

In our view *Bradley* and *Barbary Coast* incorrectly assess the section 47, subdivision 2 privilege. Other cases relied upon by Abraham for his contention "that the litigation be conducted good faith, and that the publications be made in furtherance of the litigation and to promote the interest of justice before the privilege will attach" simply do not support Abraham's theory.[17]

*Fuhrman* v. *California Satellite Systems* (1986) 179 Cal.App.3d 408 [231 Cal.Rptr. 113], does not hold that a publication made in actual litigation must be made in good faith. Rather, the *Fuhrman* court distinguished between a good faith intention to bring a suit, which the court considered a requirement before the privilege will protect *prelitigation* statements, and publications made *during* the litigation without a good faith belief in their truth, which "are protected as part of the price paid for affording litigants the utmost freedom of access to the courts." (*Id.*, at p. 422, fn. 5; accord *Herzog* v. *"A" Company, Inc.* (1982) 138 Cal.App.3d 656, 662 [188 Cal.Rptr. 155]; see also *Larmour* v. *Campanale, supra,* 96 Cal.App.3d at p. 569, fn. 2; Rest.2d Torts, § 586, com. e.) Of course, in the case at bar, there is no question the statements were made in the context of actual litigation; the federal lawsuit had already been filed when the statements about which Abraham complains were made.

In *Earp* v. *Nobmann* (1981) 122 Cal.App.3d 270 [175 Cal.Rptr. 767], the trial court found attempts to circumvent the statutory lis pendens law (by personally notifying nonparties of a claim of interest in land after the lis pendens had been expunged) constituted a deliberate circumvention of the judicial process by extrajudicial communications that were not "in furtherance of the litigation and to promote the interest of justice" and therefore were outside the scope of section 47, subdivision 2. (*Id.*, at p. 285.)[18] In the

---

[17] We note that the Supreme Court granted review in *Silberg* v. *Anderson, supra,* (Cal.App.). Review has also been granted in *Kimmel* v. *Goland*; *Morshead* v. *Silverman* (Feb. 28, 1989) A0039230 [nonpub. Opn.]; *Durant Software* v. *Herman* (Cal.App.); and *Harris* v. *Tashma* (Cal.App.), all of which involve the scope of section 47, subdivision 2. We do not discuss these cases pending the Supreme Court's review except for a footnote reference.■

[18] See also *McKnight* v. *Faber* (1986) 185 Cal.App.3d 639 [230 Cal.Rptr. 57], where this court held the absolute privilege of section 47, subdivision 2 does not protect a communication by attorneys who had represented to plaintiff (judgment creditor of the husband) that husband was securing an appeal bond when the attorneys were actually seeking a delay, not to appeal, but to fraudulently convey the subject property to wife. Justice Lillie wrote

case at bar, the allegations concern only publications at the core of judicial proceedings, which are protected by section 47, subdivision 2, and not actions intended to circumvent those established proceedings.

The court in *Walsh* v. *Bronson* (1988) 200 Cal.App.3d 259 [245 Cal.Rptr. 888], did *not* decide *Bradley* was correct; it decided only that an attorney could use *Bradley* as a defense to a malicious prosecution action. (*Id.*, at p. 270.) The *Walsh* court merely used *Bradley* to demonstrate an attorney familiar with *Bradley* could "reasonably believe" a publication might not be privileged if it was of dubious connection to the judicial proceeding and was uttered with the express objective of attempting to cloak the subsequent publication with the section 47, subdivision 2 privilege. (*Ibid.*) The court in *Walsh* thus found the attorney had probable cause to believe a defamation action based on the *Bradley* rationale might be meritorious and therefore was not liable for malicious prosecution for filing the defamation action. (*Ibid.*)

Applying the above principles to the facts of this case, we now proceed to a discussion of each cause of action in Abraham's state court action and find that the publications about Abraham are absolutely protected by the privilege of Civil Code section 47, subdivision 2.

8. *Abraham's State Court Complaint Is Barred by Civil Code Section 47, Subdivision 2.*

Under the test for application of the section 47, subdivision 2 privilege mandated by the Supreme Court and the plain meaning of the statute, LCH's motive or purpose in filing the federal lawsuit and publishing its allegations about Abraham are not material to the causes of action alleged by Abraham in his complaint. Therefore, the trial court correctly ruled as a matter of law that the Abraham complaint is barred.

First, it cannot be disputed that "[t]he filing [of] a lawsuit is a publication in the course of a judicial proceeding." (*Williams* v. *Coombs, supra*, 179 Cal.App.3d at p. 645.)

Second, Abraham's complaint is based on allegations clearly made in connection with pending federal litigation. The original federal complaint, alleging facts and legal theories similar to those in the later amended pleadings, demonstrates LCH was proceeding with a real lawsuit. The proposed amended complaint and revised amended complaint are far more than mere "anticipation of litigation," the only situation where one's good faith intent to bring a lawsuit might be an issue. (*Fuhrman* v. *California Satellite Sys-*

"plaintiff has pleaded actions undertaken by defendants to circumvent established procedures to stay enforcement of money judgments and to impede justice." (*Id.*, at p. 650.)

*tems, supra,* 179 Cal.App.3d at p. 422, fn. 5; *Carden* v. *Getzoff, supra,* 190 Cal.App.3d at p. 915; see Rest.2d Torts, § 586, com. e; *Larmour* v. *Campanale, supra,* 96 Cal.App.3d at p. 569, fn. 2.)

Third, the allegations in the federal complaints concerning appellant are directly related to the issues raised by the pleadings. The federal complaints assert monopoly, antitrust and similar causes of action based on allegedly using Antelope's perinatal services as a carrot and a stick to force others to use the hospital's medical and surgical facilities as well. The allegations relating to Abraham allege his involvement in these schemes and are inextricably linked to the gravamen of the complaint.

Fourth, the communications between counsel are directly related to the litigation and are protected by the privilege. Attorneys must be free to communicate with opposing counsel about the merits of a case and proposals for settlement without fear of subsequent lawsuits by disgruntled former opposing parties. (*Izzi* v. *Rellas, supra,* 104 Cal.App.3d at p. 264; *Lerette* v. *Dean Witter Organization, Inc., supra,* 60 Cal.App.3d at p. 577.)

Fifth, the publications in the Antelope Valley Press were confined to a report of the pleadings in the federal complaint. █ Since the articles were accurate reports of the contents of the federal pleadings (Abraham does not contend otherwise), they were absolutely privileged as a "fair and true report in a public journal, of (1) a judicial . . . proceeding." (Civ. Code, § 47, subd. 4.) Since both the pleadings in the federal court and publication in the press of a fair and true report of the pleadings are absolutely privileged,[19] it would defeat the purpose of section 47, subdivisions 2 and 4 to punish the transmittal of the privileged pleadings to the press.

█ Finally, there is the alleged communication of the allegations within the Antelope Valley and specifically within the medical community. These, too, are privileged communications. First, the local medical community possessed "a substantial interest in the outcome of the pending litigation" and as such were "participants" therein. (*Costa* v. *Superior Court, supra,* 157 Cal.App.3d at p. 678.) Second, to exclude these alleged communications about a judicial proceeding from the scope of section 47, subdivision 2 would impose a chilling effect on the public's discussion of pending litigation. Would judges or attorneys talking about allegations over lunch with their colleagues or at social dinners be subject to defamation suits? Would there be liability for hospital administrators discussing the fair and true report of allegations they read about in the Antelope Valley Press? "It

---

[19] In 1945, the Legislature amended subdivision 4 to delete the requirement that the report be "without malice." (See Historical Note, 6 West's Ann. Civ. Code (1982 ed.) § 47, p. 239.) Therefore, as long as the report is a "fair and true report," it is absolutely privileged.

would be anomalous to hold that a litigant is privileged to make a publication necessary to bring an action but that he can be sued for defamation if he lets anyone know that he has brought it [citation]." (*Albertson* v. *Raboff, supra*, 46 Cal.2d at p. 380.)

9. *Section 47, Subdivision 2 Applies to All But Malicious Prosecution Actions; the Privilege Therefore Bars Abraham's Cause of Action for Abuse of Process.*

 Abraham contends that even if the section 47, subdivision 2 privilege bars some of his complaint, it should not bar his abuse of process cause of action. He analogizes to malicious prosecution, which thus far is the only exception to section 47, subdivision 2 recognized by case law. As we now demonstrate, it is consistent with the purpose of section 47, subdivision 2 to exempt malicious prosecution while still applying the privilege to abuse of process causes of action.

Although section 47, subdivision 2 is in the defamation chapter, it "applies to virtually all other causes of action, with the exception of an action for malicious prosecution." (*Ribas* v. *Clark, supra*, 38 Cal.3d at p. 364; accord *Fellows* v. *National Enquirer, Inc.* (1986) 42 Cal.3d 234, 244 [228 Cal.Rptr. 215, 721 P.2d 97].) Many courts, including this division (*Profile Structures, Inc.* v. *Long Beach Bldg. Material Co., supra*, 181 Cal.App.3d at p. 441; *Drasin* v. *Jacoby & Meyers, supra*, 150 Cal.App.3d at p. 485), have specifically applied section 47, subdivision 2 to bar abuse of process actions.[20]

 The rationale behind allowing a malicious prosecution action while permitting section 47, subdivision 2 to bar other causes of action, including abuse of process, is clear. "The policy of encouraging free access to the courts that underlies the absolute privilege applicable in defamation actions is outweighed by the policy of affording redress for individual wrongs *when the requirements of favorable termination, lack of probable cause, and malice [the elements of a malicious prosecution action] are satisfied.* [Citations.]" (Italics added.) (*Albertson* v. *Raboff, supra*, 46 Cal.2d at p. 382; accord *Oren Royal Oaks Venture* v. *Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1169 [232 Cal.Rptr. 567, 728 P.2d 1202] [Allowing a malicious prosecution action is an " 'appropriate accommodation between the freedom of an individual to seek redress in the courts and the interest of a potential defendant in being free from unjustified litigation.' "]; *Carden* v. *Getzoff, supra*, 190 Cal.App.3d at p. 915.)

---

[20] See, e.g., *Woodcourt II Limited* v. *McDonald Co., supra*, 119 Cal.App.3d at page 249; *Umansky* v. *Urquhart, supra*, 84 Cal.App.3d at pages 371-373; *Twyford* v. *Twyford, supra*, 63 Cal.App.3d at pages 923-925; *Thornton* v. *Rhoden, supra*, 245 Cal.App.2d 80, 99-100.

This balancing of rights is an attempt to limit recovery—and repetitive litigation—in all but the most egregious and well-defined circumstances. The elements of the tort of malicious prosecution, a disfavored cause of action, have "historically been carefully circumscribed so that litigants with potentially valid claims will not be deterred from bringing their claims to court by the prospect of a subsequent malicious prosecution claim." (*Sheldon Appel Co.* v. *Albert & Oliker, supra*, 47 Cal.3d at p. 872.) ▉ Thus, the litigant who would bring a malicious prosecution action free from the section 47, subdivision 2 privilege must not only have obtained a favorable termination of the previous proceeding and convinced a judge the defendant had no probable cause to bring the prior action, but also must demonstrate malice. (*Sheldon Appel Co.* v. *Albert & Oliker, supra*, 47 Cal.3d at p. 871.)

▉ Apart from his attempt to analogize abuse of process to malicious prosecution, despite their obvious differences, Abraham also contends section 47, subdivision 2 should not apply because the tort of abuse of process will not survive if the section 47, subdivision 2 privilege bars actions based on judicial proceedings. Abraham's theory is premised on the notion that the actions covered by the tort of abuse of process are somehow coextensive with publications that are protected by section 47, subdivision 2. However, it is only under Abraham's own version of what constitutes abuse of process, a version not supported by the case law, that any such overlap between the tort and the privilege arises. In fact, as discussed below, the facts set forth in Abraham's complaint are not sufficient to state a cause of action for abuse of process. Thus, any theoretical overlap between the abuse of process tort and publications made privileged by section 47, subdivision 2 disappears in light of existing authority that, as we now explain, holds "the mere filing or maintenance of a lawsuit . . . is not a proper basis for an abuse of process action." (*Oren Royal Oaks Venture, supra*, 42 Cal.3d at p. 1169.)

10. *Section 47, Subdivision 2 Aside, the Demurrer to Abraham's Cause of Action for Abuse of Process Was Correctly Sustained Since Abraham Failed to State Facts Sufficient to Constitute an Abuse of Process.*

▉ "It is well settled that '[i]f the *decision* of the lower court is right, the judgment or order will be affirmed regardless of the correctness of the grounds upon which the court reached its conclusion.' " (Original italics.) (*Malmstrom* v. *Kaiser Aluminum & Chemical Corp.* (1986) 187 Cal.App.3d 299, 308 [231 Cal.Rptr. 820].) ▉ Here, even if the absolute privilege under section 47, subdivision 2 is disregarded, the trial court properly sustained the demurrer as to the purported cause of action for abuse of process.

■ The elements of abuse are "(1) an ulterior motive in using the process and (2) the use of the process in a wrongful manner." (*Drasin* v. *Jacoby & Meyers, supra*, 150 Cal.App.3d at p. 485.) "Some definite act or threat beyond the scope of the process is required in an abuse of process cause of action. . . . [M]ere vexation or harassment are not recognized as objectives sufficient to give rise to the tort." (*Ion Equipment Corp.* v. *Nelson* (1980) 110 Cal.App.3d 868, 876 [168 Cal.Rptr. 361].) Moreover, there is no tort where process is used properly albeit with a bad motive. (*Kyne* v. *Eustice* (1963) 215 Cal.App.2d 627, 633 [30 Cal.Rptr. 391] ["The fact that the judgment creditor may have bad intentions . . . does not impose liability upon the judgment creditor as long as he carries out the process afforded by the supplementary proceedings to its authorized conclusion."]; *Golden* v. *Dungan* (1971) 20 Cal.App.3d 295, 302 [97 Cal.Rptr. 577]; see also *Pimentel* v. *Houk* (1951) 101 Cal.App.2d 884, 886-887 [226 P.2d 739] [ulterior motive of creditor to destroy debtor financially is insufficient to establish cause of action for abuse of process where creditor who levies an attachment is fully within his rights in causing the levy and commits no act other than such as would be proper in the regular use of the process].)

■ In particular, as this court has held, "the mere filing of a complaint cannot constitute an abuse of process." (*Drasin* v. *Jacoby & Meyers, supra*, 150 Cal.App.3d at p. 485.) In *Drasin,* Justice Schauer concluded the trial court acted properly in refusing to allow plaintiff to amend his complaint to state a cause of action for abuse of process where defendant allegedly had the motive of "gaining publicity or obtaining a 'nuisance' settlement" but did no more than file a complaint for damages. (*Ibid.*; see also *Seidner* v. *1551 Greenfield Owners Assn.* (1980) 108 Cal.App.3d 895, 904 [166 Cal.Rptr. 803] ["[T]he parties who have abused or misused the process, have gone beyond the mere filing of a lawsuit."]; *Tellefsen* v. *Key System Transit Lines* (1961) 198 Cal.App.2d 611, 615 [17 Cal.Rptr. 919] [the taking of an appeal, even a frivolous one, is not enough to constitute an abuse of process; "defendant 'has done nothing more than carry out the process . . . to its authorized conclusion, even though with bad intentions . . .' "]; accord *Oren Royal Oaks Venture, supra*, 42 Cal.3d at p. 1169 ["[T]he mere filing or maintenance of a lawsuit—even for an improper purpose—is not a proper basis for an abuse of process action."].)[21]

[21] Declining to expand the tort of malicious prosecution, a unanimous Supreme Court in *Sheldon Appel, supra,* 47 Cal.3d at page 873, observed: "While the filing of frivolous lawsuits is certainly improper and cannot in any way be condoned, in our view the better means of addressing the problem of unjustified litigation is through the adoption of measures facilitating the speedy resolution of the initial lawsuit and authorizing the imposition of sanctions for frivolous or delaying conduct within that first action itself, rather than through an expansion of the opportunities for initiating one or more additional rounds of malicious prosecution litigation after the first action has been concluded." (Accord *Lossing* v. *Superior Court* (1989) 207 Cal.App.3d 635, 638-640[255 Cal.Rptr. 18]; see also *Tellefsen* v. *Key System Transit*

Analysis of other abuse of process cases confirms that more than the mere allegations of a complaint are needed to satisfy the requirements of this tort. (See *Golden* v. *Dungan, supra*, 20 Cal.App.3d at p. 301 [setting forth examples of facts sufficient to constitute abuse of process].) For example, in *Spellens* v. *Spellens* (1957) 49 Cal.2d 210 [317 P.2d 613], a husband used the provisional remedy of claim and delivery to recover possession of certain personal property, causing the sheriff to come and seal the property; he then offered to drop the claim and delivery if wife dropped her main action against him. Wife then cross-complained for abuse of process, and the Supreme Court upheld a jury verdict in her favor for that cause of action. (*Id.,* at p. 229-230.) Clearly, wife was complaining about and recovered for more than statements in a pleading.

Similarly, in *Templeton Feed & Grain* v. *Ralston Purina Co.* (1968) 69 Cal.2d 461, 466-467 [72 Cal.Rptr. 344, 446 P.2d 152], no mere publication was involved; the court found that wrongfully seizing 35,000 turkeys under a chattel mortgage at Thanksgiving amounts to an abuse of process. In *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94 [101 Cal.Rptr. 745, 496 P.2d 817], a debt collection agency's alleged filing of complaints in the wrong venue for the improper ulterior purpose of impairing adversaries' ability to defend such suits was found to be abuse of process; the court held injunctive relief was appropriate to curb the recurring abuse of process. (*Id.,* at p. 125.)[22] Likewise, in *Tranchina* v. *Arcinas* (1947) 78 Cal.App.2d 522, 524 [178 P.2d 65], defendants were found liable for abuse of process when they used a writ of possession to evict plaintiffs from their home for an ulterior purpose, in circumvention of wartime housing regulations.

In all of these cases, more than a simple publication, which would be privileged under section 47, subdivision 2, was involved. " ' "Process is a means whereby a court compels a compliance with its demands." [¶] Thus, the essence of the tort "abuse of process" lies in the misuse of the power of the court; it is an act done in the name of the court and under its authority . . . .' " (*Woodcourt II Limited* v. *McDonald Co., supra*, 119 Cal.App.3d at pp. 251-252.) The only possible "process" employed in the case at bar is the filing of a proposed first amended complaint and the revised amended complaint. But the mere filing of a complaint cannot constitute abuse of process; respondents' demurrer was therefore properly sustained as to that cause of action irrespective of the section 47, subdivision 2 privilege.

*Lines, supra*, 198 Cal.App.2d at p. 615 [Court of Appeal has remedies for frivolous appeals]; *Green* v. *Uccelli* (1989) 207 Cal.App.3d 1112, 1122-1123 [255 Cal.Rptr. 315] [preference for court hearing the order to show cause in a dissolution action to award sanctions if contempt proceeding is brought in bad faith].) Expanding the applicability of the abuse of process action, as proposed by appellant, would accomplish the result criticized in *Sheldon Appeal.*

[22] Neither *Spellens, Templeton,* nor *Barquis* even mentions section 47, subdivision 2.

## Disposition

The judgment is affirmed. Costs on appeal are awarded to respondents.

Lillie, P. J., concurred.

**JOHNSON, J.**—I concur in the judgment. My differences with the majority are solely at the margins of what is obviously a very scholarly opinion and in no way affect the outcome of this particular appeal. A full expression of those differences is best left for a future case where my reservations bear directly on issues determinative of the result.